## COLUMBUS & G. RY. CO. *v.* OWENS.*

(Division A. Nov. 26, 1928. Suggestion of Error Overruled April 8, 1929.)

[121 So. 265. No. 27385.]

*Owen & Garnett* and *A. F. Gardner,* for appellant.

*Earle N. Floyd,* for appellee.

Argued orally by *Earle N. Floyd,* for appellee.

SMITH, C. J. This is an appeal from a judgment awarding the appellee damages for the death of live stock shipped by him over the appellant's railroad.

The appellee delivered to the appellant, at Greenville, Mississippi, one hundred forty-nine mules for transportation and delivery to himself at Palatka, Florida. The cars in which the stock were transported reached Palatka over the Georgia, Southern & Florida Railway on Friday, January 15th, late in the afternoon. On account of a congestion of traffic in the yard of the delivering carrier, the cars containing the stock were not placed at the pen provided for their unloading until after midnight. Two negroes, who were on the train which included the cars in which the stock were transferred, assisted in the unloading, feeding, and reloading of the stock while *in transit,* and were understood by the conductors of the train to be caretakers of the stock for the appellee. The stock pen was large enough for stock usually unloaded therein, but was too small for this shipment, and an arrangement was made by a railroad employee and a man named Hamm, who the railroad employee thought represented the shipper, for placing the stock in a yard nearby. The stock were unloaded by the two negroes under the supervision of the railroad employees charged with the duty of delivering the stock, placed in the yard procured for their reception, and fed and watered; the feed being afterwards paid for by the appellee. The stock were apparently in good condition when unloaded, and remained in the yard until after Sunday. It was discovered some time during Saturday night that a number of them had become sick, from which sickness seventeen or eighteen of them died. One of them died while *in transit* and was removed from the car before its arrival at Palatka. The feed for the stock, or a part of it, was placed in an old iron tank that had been used in connection with an ice factory, the inside of which was covered with ''iron rust and scales  .  .  .

from an inch to three or four inches deep." An autopsy disclosed the presence of iron rust and scales in the stomach of the mules dissected; and the veterinarian who performed the autopsy stated that, in his opinion, their deaths were caused thereby; and there was no evidence from which the jury would be warranted in deciding that their deaths were otherwise caused.

The appellee, according to his testimony, did not live in Palatka, or have a representative there. His agent, Kennedy, who delivered the stock to the appellant in Greenville, arrived in Palatka on Friday. The appellee did not give to the appellant the name and address of any person authorized to accept the delivery of the stock. He and his agent, Kennedy, also disclaimed any knowledge of the negroes' accompanying the stock, and denied having authorized or permitted them so to do. The evidence negatives any negligence on the part of the appellant or its connecting carriers while the stock were *in transit*, except that thirty-six hours intervened between the last unloading and feeding of the stock and their unloading at Palatka. This element of negligence, if such it was, is of no consequence here, for the reason that it is clear from the evidence that the death of the stock was not contributed to thereby.

A request by the appellant for the following instructions was refused by the court below:

1. The court instructs the jury to return a verdict for the defendant.

2. "The court instructs you that the defendant's tariffs, approved by the Interstate Commerce Commission,- made it the duty of the plaintiff to load his mules and horses into the cars for shipment, and to unload them when the cars arrived at their destination; and the responsibility of the carrier ceased upon delivery of the cars at the usual place of delivery at the station, that is, at the stock pen where live stock shipments were usually unloaded. Upon delivery of the cars at the usual place of

delivery of carload shipments of live stock, it was the duty of the plaintiff to take charge of them, unload and look after them; and such assistance in unloading and looking after them as may have been rendered by the employees of the delivering carrier was purely voluntary, and such employee while so engaged was the agent of the owner, and not of the railroad.''

3. ''The court instructs you that you cannot allow the plaintiff any damages for the mules and horse that died after the arrival and unloading of the plaintiff's shipment at Palatka, Florida.''

The request for these instructions was based on the following extracts from the Consolidated Freight Classification No. 4, Southern Classification No. 47, E. H. Dulaney, Agent, I. C. C. No. 19, certified to by the Interstate Commerce Commission:

''In receiving Live Stock of any description for transportation, not in boxes, cages or crates, the actual delivery to the carrier does not commence until the stock has been placed in the car, and the responsibility of the carrier ceases upon the delivery of the car at the usual place of delivery at the station to which it is consigned. The owner or his agent is responsible for the loading and unloading of Live Stock, not in boxes, cages or crates, the carrier assuming no liability whatever in regard to such loading and unloading; any assistance which may be rendered by an employee of the carrier in loading and unloading shall be construed as purely voluntary, and any such employee while so engaged shall be considered the agent of the owner and not of the carrier.''

''Sec. 4. (a) The shipper at his own risk and expense shall load and unload the live stock into and out of cars, except in those instances where this duty is made obligatory upon the carrier by statute or is assumed by a lawful tariff provision. In case any person shall accompany the live stock in charge of same, he shall take

care of, feed and water the live stock while being transported, whether delayed *in transit* or otherwise, and whenever such person shall open or close any door or opening in the car or cars, or the pens or compartments in the vessel, he shall see that the same are so closed and fastened as to prevent the escape therefrom of any of the live stock.''

The contention of counsel for appellant is that, under the Consolidated Freight Classification of the Interstate Commerce Commission, the appellant's responsibility for the stock ceased upon the placing of the cars at the stock pen provided by the delivering carrier for the unloading of the stock. Counsel for the appellee assume that this freight classification applies here. Their contention is that under it the responsibility of the appellant for the stock did not cease on the placing of the cars at the stock pen, but only on the delivery of the stock to the appellee, and that the evidence does not disclose any such delivery or tender thereof.

We will assume for the purpose of the argument, but without so deciding, that it was the duty of the delivering carrier here, if within its power so to do, to notify the appellee, or his agent, of the placing of the cars containing the stock at the pen provided for their unloading, and that, in the absence thereof, no delivery of the stock was tendered. This duty, if such it was, could not have been here complied with, for the reason that there was, according to the evidence for the appellee, no one in Palatka to whom such notice could have been given until the arrival of his agent there on Sunday afternoon following the unloading of the stock on Saturday morning. As it was impossible to notify the appellee or his agent of the arrival of the stock, the delivering carrier was, of course, relieved of any duty so to do. Had the appellee been notified of the arrival of the stock, it would have been his duty, under the Interstate Commerce Commission's Consolidated Freight Classification, to have

appeared and accepted delivery of the stock, whereupon the responsibility of the appellant therefor would have ceased; and appellee could not have increased the responsibility of the appellant therefor by declining to receive the stock. It necessarily follows from this that this responsibility was not enlarged by the appellee's making it impossible for the delivery of the stock to be tendered to him. Consequently, under the Consolidated Freight Classification, the delivering carrier's employees must be considered the agents of the appellee and not of the carrier while unloading and caring for the stock until the arrival of the appellee's agent, Kennedy.

No contention is here made that the time—one or two o'clock in the morning—when the stock were unloaded was an unreasonable time to require the appellee to accept delivery thereof, and any question that might here arise relative thereto is eliminated for the reason that appellee's agent did not appear on the scene for more than twenty-four hours after the stock were unloaded.

It follows from the foregoing views that the appellant is not liable for the injury received by the stock after their unloading; and, consequently, the request for a directed verdict in its favor should have been granted.

*Reversed, and judgment here for appellant.*

### On Suggestion of Error.

The only proposition argued in the suggestion of error that seems not to be covered in our former opinion, to which we adhere, is the validity *vel non* of the consolidated freight classification promulgated by the Interstate Commerce Commission. The validity of this classification was not seriously challenged on the former hearing, as it will appear from the opinion then given. Whether the Interstate Commerce Commission had the power to promulgate this classification, in so far as it limits a railroad company's liability for injury to live stock after the car containing them has been delivered

"at the usual place of delivery at the station to which it is consigned," is a question of considerable difficulty. We are inclined to doubt the validity of that provision of the classification, but are unable to say with any sort of confidence that it is not valid. This being true, it becomes our duty to enforce it.

An extended discussion of the question would be of no benefit to counsel—for they, themselves, have exhausted the question in their briefs—nor to the bar generally, as the ultimate decision of the question rests, not with us, but with the supreme court of the United States.

*Overruled.*