**TEXTRON, Inc., v. LOWELL TRUCKING CORPORATION et al.**

Civ. 36–652.

District Court, S. D. New York.

July 14, 1947.

Bigham, Englar, Jones & Houston, of New York City (John M. Aherne, and James M. Hughes, both of New York City, of counsel), for plaintiff.

John W. Ansell, of New York City, for defendant Lowell.

Frank Pascarella, of New York City, for defendant, Magnone.

LEIBELL, District Judge.

This is a suit by Textron Inc., a manufacturer of textiles against two defendants, Lowell Trucking Corporation, an interstate common carrier by motor vehicle, and Louis Magnone, Inc., a local truckman, for the loss of 34 cartons containing about 63,000 yards of satin rayon piece goods of a value of $18,337.65. The cartons had been shipped from Lowell, Massachusetts, September 10, 1945 by Brooks Ltd. (a manufacturing agent of Textron Inc.) consigned to Marlene Sportswear Inc. in New York City. Lowell Trucking Corporation transported the shipment from Lowell, Massachusetts, to New York City. Marlene refused to accept the shipment when tendered by Magnone, who made local deliveries for Lowell. The goods were stolen the night of September 19-20, 1945 while on a truck in Magnone's garage at 111 West 15th Street, Manhattan. Magnone had received the cartons from Lowell's trailer on September 11th at Magnone's garage for delivery to Marlene Sportswear Inc. At the time of the theft Magnone was holding the cartons on a truck in Magnone's garage at Lowell's request and was awaiting further instruction from Lowell.

The complaint charges that both defendants are common carriers of goods for hire; that Lowell operates under a certificate of the Interstate Commerce Commission; that Magnone holds a public cartman's license issued by the City of New York; that Lowell had filed tariffs with the Interstate Commerce Commission and issued a bill of lading for the merchandise when shipped; that Magnone was Lowell's local delivery agent. The first cause of action is against Lowell for breach of its contract as a common carrier; the third cause of action asserts a similar claim against Magnone; the second cause of action is against Lowell for negligence, and fourth is against Magnone for negligence.

The defendant Lowell's answer contains certain denials and a defense that the consignee Marlene refused to accept the merchandise when tendered on September 11th; that notice of non-delivery was mailed to the shipper and consignee on September 13th; that no instructions were received from the shipper or the consignee during the free time allowed by the tariffs; that Lowell's liability as a common carrier ceased at 7 a. m. September 17th with the expiration of the free time; that thereafter Lowell's liability was only that of a warehouseman; that the shipment was kept at the premises of Magnone until stolen; that this storage was permissible under the provisions of Sec. 4(a) of the Bill of Lading and Item No. 1540 of Lowell's published tariffs; that Lowell was not guilty of any negligence in caring for the merchandise.

Magnone pleaded a number of special defenses to the third and fourth causes of action alleged in the complaint. These defenses were that plaintiff was not the real party in interest having allegedly assigned its claim to its insurance carrier; that title to the merchandise became vested in Marlene, the real party in interest; that Marlene refused the merchandise on September 11th and Lowell immediately gave notice of said refusal; that plaintiff suffered the merchandise to remain in Magnone's garage; that Magnone is not a common carrier; that Magnone was not guilty of negligence. The defense that Textron is not the real party in interest is completely refuted by the documentary evidence and will not be further considered.

The defendant Lowell has pleaded certain cross claims against the defendant Magnone: One for Magnone's breach of contract as a common carrier in respect to Lowell; a second for negligence; and, by amendment at the trial, a third on an al-

leged warranty and representation by Magnone, in order to induce Lowell to engage Magnone, that Magnone was of sufficient financial worth to be responsible for the safe delivery of goods received from Lowell and had a sufficient "all risk" cargo policy of insurance in force to cover all merchandise received by Magnone from Lowell for delivery, which said agreement Magnone is alleged to have breached. Magnone denies that it was a common carrier, denies that it was guilty of negligence, and denies that it ever made any agreement with any warranty or representation as alleged by Lowell.

Plaintiff, Textron Inc., is engaged in the textile business. It manufactures cloth and purchases goods for finishing. It does its own converting. Through a manufacturing agent, Brooks, Ltd., plaintiff, in 1945, had some of the manufactured cloth made up into wearing apparel which it sold to the retail trade. This manufacturing work Brooks Ltd. let out to subcontractors, such as Marlene Sportswear Inc. Marlene had offices at 141 West 36th Street, New York City, and shipped the materials to plants in Pennsylvania for manufacture. Brooks Ltd. had no personnel of its own, except a part time employee. Its office at Lowell, Massachusetts, was with the plaintiff, and it was operated under plaintiff's supervision with plaintiff's employees. Brooks Ltd. also had an office in the home of Philip Brooks, at 18 Duncan Avenue, Jersey City, New Jersey. Brooks Ltd. was Philip Brooks trading as such.

The defendant, Lowell Trucking Corporation, is an interstate common carrier by motor vehicle, with terminals in New England and New York. In September 1945 it had terminals at Boston and at Lowell, Massachusetts. Its New York terminal was at 625 West 23rd Street, New York City. The New York terminal was wide enough to back in three trailers. It could accommodate six trucks side by side. Lowell had offices upstairs. Another truck operator, McCormak Co., had the right to use the terminal for its incoming and outgoing freight. There was a large platform at the rear of the terminal on which Lowell could store 80 or 100 tons of freight, the capacity of 8 or 10 trailers. The Lowell Trucking

Corporation was duly certificated by the Bureau of Motor Carriers of the Interstate Commerce Commission and engaged in business as an interstate common carrier for hire, transporting property pursuant to the terms of a Bill of Lading issued to the shipper and pursuant to a schedule of tariffs filed with the Interstate Commerce Commission.

■ The defendant, Louis Magnone, Inc., was the holder of a Public Cartman's License issued by the City of New York. Louis Magnone, Inc. was not a common carrier but delivered merchandise for about 10 business concerns by special arrangements with them, to consignees within the City of New York. Magnone had 6 or 7 trucks. Under an oral arrangement with Lowell, many of the shipments Lowell transported to New York City were turned over to Magnone at Magnone's garage at No. 111 West 15th Street, Borough of Manhattan, for delivery by Magnone's trucks and men to local consignees. The transportation furnished by Magnone must be considered to have been performed by the common carrier, Lowell. Title 49 U. S.C.A. § 302(c) (2). At the time Lowell's trailers transferred merchandise to Magnone's trucks at Magnone's garage, Magnone would receive a list of the shipments and also a driver's return receipt for each lot (Ex. C) on the printed form of the Lowell Trucking Corporation. The driver's return receipt was intended to be signed by the consignee named therein, who would pay the freight charges listed on the receipt (if it was a freight C. O. D. shipment) upon receiving the merchandise described therein.

The 34 cartons of rayon piece goods were accepted by the Lowell Trucking Corporation at Lowell, Massachusetts, September 10, 1945 (a Monday) from Brooks Ltd. of 750 Suffolk Street, Lowell, for transportation to New York City and delivery to the consignee, Marlene Sportswear Inc., 141 West 36th Street, New York City. There was issued to the consignor a uniform straight bill of lading on the printed form of Lowell Trucking Corporation (Ex. 2). On the reversed side of the Bill of Lading were printed the "contract terms and conditions". The Bill of

Lading was the "Uniform Straight Bill of Lading" as adopted by the Interstate Commerce Commission. 49 C.F.R. 595. It was intended for railroads. The pertinent provisions thereof are the following:

"Sec. 1(a) The carrier or party in possession of the property herein described shall be liable as at common law for any loss thereof or damage thereto except as hereinafter provided."[1]

\*     \*     \*     \*     \*

"Sec. 4(a) Property not removed by the party entitled to receive it within the free time allowed by tariffs, lawfully on file (such free time to be computed as therein provided), after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly sent or given, and after placement of the property for delivery at destination has been made, may be kept in vessel, car, depot, warehouse or place of delivery of the carrier, subject to the tariff charge for storage and to carrier's responsibility as warehouseman, only, or at the option of the carrier, may be removed to and stored in a public or licensed warehouse at the place of delivery or other available place, at the cost of the owner, and there held without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage."[2]

Tariffs No. 2-B (Ex. 3) filed by Lowell with the Interstate Commerce Commission contained the following provisions in respect to the redelivery of freight and storage:

"Item No. 1535. Redelivery of Freight

If the consignee or consignor requests the carrier to redeliver freight to the place of delivery specified in the bill of lading, on a shipment which the carrier, through no fault of its own, has been unable to deliver upon tender of delivery, or after a reasonable effort to affect delivery has been made, the charges for such redelivery will be as follows:

Charges will be computed on the rate applicable from the point of delivery specified on the bill of lading to the point at which the carrier's nearest terminal is located, plus the rate applicable from the point at which the carrier's nearest terminal is located to the point of delivery specified on the bill of lading. The charges set forth herein to be in addition to the charges for storage as set forth in Item No. 1540. For rate scale numbers to apply between points in New Jersey and New York see Item No. 1565."

"Item No. 1540.   Storage

(a) Shipments which, through no fault or negligence of the carrier, are refused by consignee, or which the carrier for other reasons beyond its control cannot deliver, will, after the expiration of free time as provided in paragraph (b) of this rule, be placed in storage and notification thereof given in writing to the shipper and consignee.

(b) Shipments which, through no fault

---

[1] The common law liability is "authoritatively expressed in Pratt v. Railway Co., 95 U.S. 43, 24 L.Ed. 336" as stated in Hough, J.'s dissent in Lehigh Valley R. Co. v. John Lysaght, Ltd., 2 Cir., 271 F. 906 at 911. Judge Hough added "the liability of the carrier as carrier is fixed by accepting the property to be transported, and such acceptance is complete whenever the property comes into his possession with his assent. The liability continues until delivery or its equivalent". Holmes in his lectures on The Common Law discusses the development of the responsibility of a common carrier into an insurer under the common law (See Lecture entitled "The Bailee at Common Law".) He cites the opinion of Lord Mansfield in Forward v. Pittard, 1 T.R. 27, and 2 Kent 597. Kent (at p. 602) said "The rule makes the common carrier in the nature of an insurer, and answerable for every loss not to be attributed to the act of God, or public enemies". The purpose of the Bill of Lading, the common law rules as to a common carrier's liability, the Federal Statutory limitations on the stipulations and conditions of a Bill of Lading, the judicial interpretation of the Federal Statutes, the powers and the jurisdiction of the Interstate Commerce Commission to issue regulations which prescribe terms and conditions of the Bill of Lading, are all discussed in great detail in Report No. 4844 of the Interstate Commerce Commission (April 14, 1919), In the Matter of Bills of Lading, 52 I.C.C.Reports 671.

[2] Uniform Bill of Lading Provisions, 52 I.C.C.Reports 713; 64 I.C.C.Reports 357.

or negligence of the carrier, remain undelivered after forty-eight hours (free time) (See Note) from the first seven o'clock A.M. following the day on which notification of the failure of the carrier to effect delivery is sent to the shipper and consignee, may thereafter be held on the carrier's premises subject to responsibility on the part of the carrier as warehouseman only, and to storage charges as provided in paragraph (c) ; or, at the option of the carrier, may be removed to and stored in a public or licensed warehouse at the place of delivery or other available place, at the cost of the owner, and there held without liability on the part of the carrier, and subject to lien for all freight and other lawful charges, including a reasonable charge for storage.

Note—In computing free time, Sundays and legal holidays (not half holidays), National, State and Municipal, will be excluded. When a legal holiday falls on a Sunday, the following Monday will be excluded.

(c) The following rates and minimum charges for storage will be assessed on less truckload shipments held on the carrier's premises beyond the free time set forth in Paragraph (b).

| Period Beyond Free Time | Rates |
|---|---|
| For each of the first five days beginning with the expiration of free time as provided in Paragraph (b) hereof. | 2 cents per hundred pounds (note) per day or fraction thereof. |
| For the Sixth and each Succeeding day | 3-¾ cents per hundred pounds (Note) per day or fraction thereof. |

Note. The minimum storage charge per shipment will be 60 cents.

(d) In computing storage charges, fractions of 100 pounds will be treated as 100 pounds, and fractions of a day will be treated as a day."

Item No. 1540 of the carrier's tariff contains two specific and binding agreements of the carrier. In subdivision (a) the carrier agrees without any condition or reservation that shipments which "are refused by consignee" will, after the expiration of

free time as provided in paragraph (b) of this rule, be placed in storage and notification thereof given in writing to the shipper and consignee. Subdivision (b) is broader and provides that after the expiration of the 48 hours free time following the sending of notice of non-delivery to the shipper and consignee, the carrier may either (1) hold the shipment "on the carrier's premises with the responsibility of a warehouseman only" or (2) remove and store the shipment in a public or licensed warehouse and be "without liability".

It should be noted that subdivision (c) of the Item 1540, relates to storage rates on less than truckload shipments "held on the carrier's premises beyond the free time". The same wording "held on carrier's premises" is found in subdivision (b). Magnone's garage was not "the carrier's premises".

The 34 cartons were less than a truck load shipment (Ex. VI). They were transported to New York in Lowell's Trailer No. T-21 by Tractor No. 70 and were routed to Lowell's New York office. The 34 carton shipment was listed on one of Lowell's manifests (Ex. VII). The consignor, Brooks Ltd. of Lowell, Mass., mailed Marlene Sportswear, Inc., 141 West 36th Street, New York City, a packing list (Ex. 1) showing in detail a description of the merchandise in each carton. The piece goods had been purchased by Textron from the Manville Jenks Corp. for a total price of $18,337.65 late in the Spring and during the Summer of 1945. The prices were the OPA ceiling prices then in effect. The merchandise was worth at least that much when it was stolen September 19-20, 1945.

The tractor and trailer containing the 34 cartons and other merchandise arrived in

328

New York early in the morning of September 11th. The 34 cartons were in the front part of Lowell's trailer and were not intended for Magnone to deliver. When Lowell is not busy, Lowell keeps the large lots. The tractor and trailer were driven to Magnone's garage at No. 111 West 15th Street, Borough of Manhattan. When Lowell's driver called up the New York dispatcher, he was probably told to give the 34 cartons shipment to Magnone, together with the other smaller lots on the trailer. The 34 cartons were unloaded about 7 a. m. from Lowell's trailer onto a G.M.C. truck owned by Magnone. Magnone received no manifest from Lowell with this 34 carton shipment, although he usually received a manifest, because of the last minute telephoned instructions. He did receive a "driver's return receipt", (Ex. C) to be signed by the consignee, Marlene, on delivery.

Magnone (Louis) called Marlene several times that morning (September 11th) about accepting delivery, but got no satisfaction. He then dispatched the G.M.C. truck to Marlene's with instructions to the driver to phone Magnone from a place near Marlene's. Magnone could get no agreement from Marlene to receive the goods, so Magnone notified his driver to return with the shipment to Magnone's garage, which he did. Magnone notified Miss Rosenthal at Lowell's New York office the morning of the 11th that Marlene had refused to accept the shipment. At Lowell's specific request Magnone kept the cartons on the truck at Magnone's garage, awaiting further instructions from Lowell. Although Magnone spoke to Mr. Cohen of Lowell's office almost every day about the 34 cartons, he never received orders to redeliver the cartons to Marlene. Cohen would promise to get a redelivery of the cartons. Magnone told Cohen he needed the truck and Cohen said that they could not take the cartons at Lowell's because Lowell did not have the space.

Magnone parked the G.M.C. truck, with the 34 cartons on it, in the northwest corner of the garage. Magnone's garage was a low one story building (Exs. A and A-5), 25 feet wide and 100 feet deep located on 15th Street about 125 feet west of Sixth

Avenue in a neighborhood that is half residential (rooming houses) and half small manufacturing establishments. The roof had several skylights that were barred (Ex. A-31). The buildings alongside the garage, to the west and east, had solid blank walls (Exs. A-2 and A-3). A building to the rear (a dance hall) was separated from the rear of Magnone's garage by a space of about 8 feet. Magnone's rear wall was solid. The opening at the front of Magnone's garage consisted of three sliding doors, two of which could be moved to permit trucks to enter and leave; the sliding door to the west was in a fixed position (Ex. A and A-1). The other two sliding doors over-lapped and at night were secured by two bolts and nuts. The bolts came through both doors from the outside, and each bolt was held in place by a nut put on from the inside. In the easterly sliding door there was a small single door on hinges, with a special lock, known as a Lewis Patrol Lock, property of the Super Lock Corporation (Ex. A-4). When a key is turned in the lock, a buzzer sounds. The Lewis Patrol Service had a contract (Ex. B) under which it rented this lock to Magnone. The contract described it as a "Jimmy-proof rim lock with Burglar Proof Cylinder". The lessee was given three keys for the lock. The Lewis Patrol also furnished night patrol service of a sort; a single special officer covered the territory from 8th to 23rd Streets between 5th and 7th Avenues, where Lewis had several hundred places under contract. His job was to try the door to see if it was locked and to drop a card showing that he had been there. He was supposed to check the premises twice a night. He did not discover or report this burglary, although in order to get the truck containing the 34 cartons of rayon out into the street it was necessary to remove 6 other trucks from Magnone's garage. The lock was no protection if some one from the inside removed the nuts from the large bolts and slid back the large door in which the small door was so securely locked. The lock had not been touched in executing the theft.

There was an iron ladder inside Magnone's garage (on the east side to the

front) which rose to a trap door in the roof. The trap door was of wood covered with an outside metal sheeting. It was held in place by two hooks and eyes and there may have been a wire which could be fastened to the ladder. On the morning of the robbery the trap door was found open, the hooks were pulled from the eyes. There was no indication of the use of force from the outside. The roof of the garage was easily accessible from the street with a small extension ladder, or from the windows of the rooming house to the west. It would not be too difficult to climb to the roof of the garage from the street, using the projections of either the building to the West or the building to the East. (See photograph, Ex. A). Once inside the garage the sliding doors could be opened by removing the nuts. I have described in some detail the Magnone garage because I have concluded that it was negligence on the part of Lowell to have kept this valuable cargo of rayon on a truck in Magnone's garage for over a week. In order that the trucks might be easily moved, their ignition keys were left in the trucks over night, including the G.M.C. truck with the cartons. This may have been a proper precaution in case of fire, but it made the execution of this theft possible.

Lowell's own terminal at 625 West 23rd Street was large and had offices on the second floor. The terminal was wide enough to permit 6 trucks to be backed side by side to the loading and storage platform at the rear. The platform had a capacity of 80 or 100 tons of merchandise. Lowell's had a special night patrol service, somewhat like Magnone's; it also had alarm locks.

Lowell was informed by Magnone on September 11th that Marlene had refused to accept the shipment. Mr. Cohen, a trouble shooter for Lowell, called Marlene the following day and was told that Marlene was pretty crowded and would let him know the next day. The same thing happened on the 13th. On the evening of September 13th a Miss Rosenthal of Lowell's mailed refusal notices (Exs. 14 and 15) to Marlene Sportswear Inc., 141 West 36th Street, New York City, and to Brooks Ltd., 18 Duncan Avenue, Jersey City, New Jersey. The refusal notice to Marlene (Ex. 14) was dated September 13, 1945, and read as follows:

"Lowell Trucking Corporation
Notice of Non-Delivery

To Marlene Sportswear Inc.    Sept. 13, 1945
   141 W. 36th St.,                         A.M.
   New York City                           P.M.

Your Shipment of September 10, 1945 Consisting of 34 cartons from Brooks Limited, Lowell, Mass. is being held at this terminal, for the following reasons: You refused to accept shipment at the above address, you have not as yet given us disposition. We are holding merchandise at your own risk—also subject to storage charges.

Please give Immediate Instructions for Disposition of Above, as Shipment will be Held at Your Own Risk, after 48 Hours have Elapsed from the Above Posted Time."

The notice to Brooks Ltd. (Ex. 15) was undated and read as follows:

"Lowell Trucking Corporation
Notice of Non-Delivery

To Brooks Ltd.                        193
18 Duncan Ave.,                      A.M.
Jersey, N. J.                            P.M.

Your Shipment of September 10, 1945 Consisting of 34 Ctns to Marlene Sportswear, 141 W. 36th St., New York City, is being held at this terminal, for the following reasons: Refused    Shipment is being held at terminal at your own risk. Kindly advise disposition.

Please give Immediate Instructions for Disposition of Above, as Shipment will be Held at Your Own Risk, after 48 Hours have Elapsed from the Above Posted Time."

The Lowell filed tariff did not require the shipper or the consignee to give instructions as to disposition of the shipment after sending nondelivery notice; they could reply on the contract as fixing the duties of Lowell after refusal of the consignee to accept delivery.

Brooks (Philip) testified that he did not receive the notice of non-delivery until September 21st, the day after the theft. He had heard of the theft the afternoon of September 20th. Although it appears that Miss Rosenthal typed in the date on one of the carbons of this notice to Brooks (Ex. II) after September 13th, I am satisfied

that she mailed the notice to Brooks the evening of the 13th, as she testified. Brooks denied any knowledge of the non-delivery of the 34 cartons until after the theft, but Mr. Cornell of Textron testified that he had spoken to Brooks September 15th about getting Marlene to accept the shipment. A copy of the packing list had been mailed to Brooks, Ltd., Jersey City, from Brooks, Ltd., Lowell, Mass. on September 12th. An employee of Marlene's (Marvin Attias) testified that he received phone calls from Lowell's representative on September 12th, 13th and 15th and that he told Lowell to hold the goods, but did not tell Lowell when Marlene would be ready to receive the goods. As to the non-delivery notice, he thought Marlene received it around the 22nd. It is my belief Marlene received the notice on the 14th.

The non-delivery notice to Marlene stated in the printed form that the 34 cartons were "being held at this terminal". The non-delivery notice to Brooks Ltd. Jersey City, contained the printed statement above quoted and also had typed thereon the words "Shipment is being held at terminal at your own risk". Both notices contained at the foot thereof the following: "Reply to Lowell Trucking Corp., 625 W. 23rd St. N.Y.C." There is no evidence whatsoever that Textron, Inc., or Brooks, Ltd. or Marlene Sportswear, Inc. was ever informed or actually had knowledge that this valuable shipment of 34 cartons of rayon was being kept all this time on a truck at Magnone's garage, and not at Lowell's premises. Textron learned on September 12th of the refusal of Marlene to accept the 34 cartons. Mr. Cornell, Production Manager of Textron, was so informed by Mr. Brennan who was in charge of shipping under Cornell's direction. On September 12th Mr. Cornell spoke on the phone to a Mr. Kraemer at Marlene's who told Mr. Cornell that Marlene lacked space to handle the shipment but said that he would make arrangements to take the shipment in. No definite time was stated, but Mr. Cornell understood that immediate redelivery would be made. On September 15th Cornell heard that Marlene again had refused to accept the shipment, so Cornell called Philip Brooks at Jersey City to arrange for acceptance of the merchandise by Marlene.

Packing lists (Ex. 1) of the 34 cartons (Lowell's shipping number L83923) was forwarded to Marlene by Brooks, Ltd. (per John F. Ward) in a letter dated September 12, 1945 (Ex. 20). The last sentence of the letter advised Marlene that "The necessary findings will be shipped to you in the near future".

On September 13, 1945 Brooks Ltd. of Lowell, Massachusetts, shipped to Marlene Sportswear, Inc., New York City, by Lowell Trucking Corporation, 11 packages of Buttons and Luserts Label Tissue. This shipment is known by Lowell's number L84235 (Ex. XVII). Marlene refused to accept it and a refusal notice was mailed September 14th. The packages were kept at Lowell's terminal on West 23rd Street. On September 24th certain labels from this shipment were delivered to a representative of Marlene at Lowell's New York Terminal (Ex. XVI A). The balance of this shipment was at the direction of Marlene delivered to Preferred Storage Warehouse, 157 West 124th Street, New York City, September 25, 1945 (Ex. XVII).

On September 13, 1945 Brooks Ltd. of Lowell, Massachusetts, also shipped to Marlene Sportswear, New York City, by Lowell Trucking Corporation 20 cartons of Rayon Piece Goods. That shipment was given Lowell's number L84236. Marlene refused to accept this shipment. Refusal notices were mailed by Lowell on September 14th. The cartons were kept at Lowell's New York terminal on West 23rd Street. On September 25th the 20 cartons were delivered to the Preferred Storage Warhouse at the direction of Marlene (Ex. 20).

On September 14, 1945 Brooks Ltd. of Lowell, Massachusetts shipped to Marlene Sportswear, New York City, 27 cartons of Rayon Piece Goods which were refused by Marlene. The shipment bore Lowell's number L84478. Refusal notices were mailed by Lowell September 18th. The cartons were kept at Lowell's New York Terminal on West 23rd Street until they

were delivered to the Preferred Storage Warehouse on September 25th on instructions from Marlene (Ex. XVIII).

On September 14, 1945 Brooks Ltd. shipped from Lowell, Massachusetts by the Lowell Trucking Corporation to Marlene Sportswear, New York City, one box of buttons and one bundle of cardboard inserts. The shipment bore Lowell number L84477. The shipment was refused by Marlene and refusal notices were mailed by Lowell on September 18th. The shipment was kept at Lowell's New York terminal on West 23rd Street until September 25th when it was delivered to the Preferred Storage Warehouse at the direction of Marlene (Ex. XIX).

On September 25th Brooks Ltd. wrote Lowell in New York a letter of authorization (Ex. XII) to release shipments from Brooks Ltd., Lowell, Massachusetts, consigned to Marlene Sportswear, New York City, and to deliver the shipment to Preferred Storage Warehouse. This letter referred to the September 13th and September 14th shipments. Lowell would not deliver to the warehouse without written instructions from Textron or Brooks. The two shipments of the 13th and 14th were delivered to the Preferred Storage Warehouse in accordance with the Brooks Ltd. letter of September 25th.

Mr. Brennan of Textron had a number of telephone talks with Mr. Earle Hutchinson of Lowell's office at Lowell, Massachusetts, about the 34 carton shipment of September 10th. Textron's office was also at Lowell, Massachusetts. Brennan told Hutchinson on September 14th to redeliver the 34 cartons to Marlene. On September 16th Hutchinson advised Brennan that Marlene had again refused to receive the shipment and Brennan again told Hutchinson to redeliver. A phone conversation between Brennan and Hutchinson on September 17th was to the same effect, except that Brennan added that Cornell said it was O.K. to redeliver. Apparently as a result of the phone talk between Brennan and Hutchinson on September 17th, "B. S." (Bertha Sandler, secretary to Earle Hutchinson) on behalf of Lowell sent the New York Lowell office on September 18th an inter-office communication (Ex. 10) reading as follows:

"Re L84235—L84236—L83923

Above 3 shpts are from Brooks Ltd. Lowell to Marlene Sportswear, 141 W. 36th St., N.Y.C. on which you sent us copy of refusal notices. Brooks Ltd. (Atlantic Rayon) want these 3 shpts redelivered to Marlene Sportswear Co. So please redeliver and put on redelivery charges. However, Earle says to deliver this with as little fanfare as possible. That is, put on redelivery charges, however, if consignee refuses to pay any redelivery charges, just simply redeliver to them. And let us know and we will bill back shipper for redelivery charges.

Please take care of this accordingly."

The September 18th inter-office communication from Lowell, Massachusetts, was received by Lowell's New York office on the morning of the 19th and appears to have had the attention of the New York office that day. On the evening of September 19th Miss (Gertrude) Rosenthal sent "B. S." an inter-office communication from Lowell's New York office (Ex. 11) which read as follows: "You advise to redeliver these shipments to Marlene Sportswear. Marlene will not take in these shipments until next week at least. They haven't any room for all this merchandise. When we redeliver we will apply redelivery charges and storage. As per your instructions if they do not pay we will leave shipments and you can bill shipper."

The last inter-office communication arrived in Lowell, Massachusetts, about 7 a. m., September 20th. The theft of the 34 cartons from Magnone's garage took place the night of September 19-20 and was discovered by one of Magnone's employees (Mondo Squeri) at 6:30 a. m. September 20th. When Squeri arrived at Magnone's garage he saw the trucks out in the street (except the G.M.C. truck with the 34 cartons). The sliding doors were not bolted, but were closed together. Squeri entered the garage and found that the G.M.C. truck with the 34 cartons was missing. He went to the nearest police station to report the theft. About 9:30 a. m. that morning the

missing truck was found empty, near pier 65 North River (Manhattan).

■ After Marlene's refusal to accept the 34 cartons on September 11th they were kept on the G.M.C. truck at Magnone's garage at the special request of Lowell, because Lowell's terminal was crowded. Lowell knew all about the conditions at the Magnone garage and was content that Magnone should hold the cartons as they were. Lowell did not ask that any special precautions be taken to protect this valuable shipment from theft. The theft cannot be charged to any negligence on Magnone's part. Entry to the garage was probably had through the trap door on the roof. The eyes of the hooks, used to hold the trap door in place, had been broken and the trap door was found open the morning of the theft. The two bolts, used to hold together the two overlapping sliding doors, were missing. The nuts were on the floor, inside. Magnone did all it was supposed to do for Lowell in protecting the 34 cartons shipment and accordingly is not liable to Lowell.

■ Although Magnone was not negligent in fulfilling its obligations to Lowell, nevertheless Lowell was negligent in permitting this valuable shipment of 34 cartons of rayon piece goods to remain at Magnone's garage more than a week under the conditions above described. Lowell must have known of the many instances of highjacking of trucks with valuable cargoes and of thefts from trucks in garages, which were reported in New York City newspapers in recent years. Criminal prosecutions in a number of cases have been instituted in this Court, where the merchandise was stolen from interstate commerce, or where the stolen merchandise was later transported across state lines. A cargo of 34 cartons of rayon piece goods in September 1945 would be a very attractive prize for the highjackers. If Lowell had no room for the cartons on the platform at its own terminal in New York City, it should have found room for them in some licensed or public warehouse. The Bill of Lading and the filed tariffs imposed that duty on Lowell. The filed tariffs are part of the transportation contract. Boston & Maine R. v. Hooker, 233 U.S. 97, 34 S.Ct. 526, 58 L.Ed. 868, L.R.A.1915B, 450 Ann.Cas.1915D, 593. The contract of transportation "includes both the services of transportation and storage under the Act". Iron City Produce Co. v. Penn. R. R., 206 I.C.C. Reports 63 at p. 69.

Lowell's liability as a common carrier terminated at 7 a. m. on September 17th at the expiration of the 48 hours free time following the mailing on September 13th of the notice of nondelivery to the consignor and consignee, delivery having been refused by the consignee when tendered on September 11th. But that did not end Lowell's responsibility under the contract of transportation. It had certain specific obligations as to storage. If Lowell failed to fulfill its obligation as to the place and conditions under which it was to keep or store the shipment as specified in the tariffs, Lowell breached its contract of transportation, as hereinabove indicated. That is something separate and distinct from Lowell's liability as a warehouseman after Lowell ceased to be liable as a common carrier.

■ Lowell argues that Magnone's garage should be considered an "other available place" to which Lowell could remove and store the shipment under Sec. 4(a) of the Bill of Lading, and that having done so Lowell's liability was only that of a warehouseman. This argument suffers from two defects: it cuts off the words "other available place" as if they were unrelated to the words "public or licensed warehouse", and it disregards the applicability of the very next clause, "and there held without liability on the part of the carrier". If the first part of Lowell's argument were sound then the storage in that "other available place" would completely terminate all liability on the part of Lowell, which in this case would mean that on storage of the shipment in Magnone's garage Lowell would not be liable even as a warehouseman. Magnone's garage was not a "public or licensed warehouse". The construction for which Lowell contends would render meaningless the requirement as to storage in a "public or licensed warehouse". If the words "other available

place were given the meaning for which Lowell contends, then we would have the following anomalous situation that by keeping the 34 cartons at Lowell's terminal after the expiration of the free time, Lowell's liability would be that of a warehouseman, but by keeping the cartons at Magnone's garage the shipment would be "without liability" on the part of Lowell. Such a distortion of the language of the Bill of Lading is both illogical and contrary to the public policy which led to the adoption of a uniform bill of lading. Further, the filed tariffs (Item No. 1540), which are more specific and are controlling, would have to be given the same shocking construction. Both the Bill of Lading (designed originally for railroads) and the Tariffs (filed by the motor carrier) had the approval of the Interstate Commerce Commission. It is hard to believe that the Commission would approve a provision that could be interpreted to produce such inconsistent and harmful results.

Lowell's contention would give to the language of Sec. 4(a) of the Uniform Bill of Lading as approved by the Interstate Commerce Commission, a meaning which the National Industrial Traffic League embodied in a form of a straight Bill of Lading which it submitted to the Interstate Commerce Commission for approval in 1921.[3] The language in the League's form omitted the words "other available place" and inserted the words "or other suitable place" after the words "public or licensed warehouse". The League's form would have made the carrier's liability after storage of the shipment that of a "warehouseman only". See 64 I.C.C.Reports (1921), page 357, Appendix A. The Commission rejected these suggested changes of the League and retained Sec. 4(a) unchanged

in the form approved as Appendix D in said report. Although certain modifications of the Uniform Straight Bill were made in Appendix D "in view of the change in the Interstate Commerce Act made on February 28, 1920", no change was made to Sec. 4(a) of the Bill of Lading. What Lowell's counsel would have the Court do is to so interpret the language of Sec. 4(a) of the Commission's Uniform Bill of Lading as to give it the effect of the change which was unsuccessfully sought by the League in its proposed modification of Secs. 4(a).

The earlier Report of the Interstate Commerce Commission, No. 4844, In the Matter of Bills of Lading, 52 I.C.C. 671 (April 14, 1919) discusses the Section 4(1) [now Sec. 4(a)] as submitted by the Carriers which included a provision "and there held at the owner's risk" immediately preceding the words "without liability on the part of the carrier". The shippers opposed Sec. 4(1) in toto and especially that part of it which included the provision "and there held at the owner's risk". The Commission discussed this objection (at p. 713) and stated:

"One particular objection to the clause here considered is laid against the phraseology of the provision that in the event of nondelivery after specified time the property may, at the option of the carrier, be stored in a public or licensed warehouse at the place of delivery or other available place, at the cost of the owner, 'and there held at the owner's risk,' etc. It is urged in behalf of some of the shippers that if the entire paragraph is not eliminated that at least the words 'at the owner's risk and' should be eliminated, leaving the wording to read 'and there held without liability on the part of the carrier.' It is urged that

---

[3] The League's proposed form provided: "Sec. 4(a) Property not removed by the party entitled to receive it within the free time allowed by tariffs lawfully on file (such free time to be computed as therein provided), after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly sent or given, and after placement of the property for delivery at destination has been made, may be kept in vessel, car, depot, warehouse or place of delivery of the carrier, sub-

ject to the tariff charge for storage and to carrier's responsibility as warehouseman, only, or, at the option of the carrier, may be stored in a public or licensed warehouse, or other suitable place, at the place of delivery, at the cost of the owner, and there held, subject to the carrier's responsibility as warehouseman only, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage." 64 I.C.C. Reports following p. 364.

this be done because there is at least a possibility that it might be held, under the terms of the provision, that the public or licensed warehouse in which the goods are stored incurs no liability whatsoever, even as a warehouseman, although its regular storage rates are being paid by the shipper or consignee.

We think this objection is well taken. As stated upon brief by the shippers, 'clearly the purpose of the phrase above quoted is only to relieve the carrier from liability where the goods are sent to a public or licensed warehouse, and there is obviously no reason why the carrier should include in its bill of lading a phrase which may be construed as relieving the public or licensed warehouse from any responsibility whatsoever for the safe-keeping of the goods.'

The rule can not be approved in the form proposed by the carriers. In lieu thereof, we are of the opinion that a rule phrased as follows would be just and reasonable.

Property not removed by the party entitled to receive it within the free time allowed by tariffs lawfully on file (such free time to be computed as therein provided), after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly sent or given, and after placement of the property for delivery at destination has been made, may be kept in vessel, car, depot, warehouse or place of delivery of the carrier subject to the tariff charge for storage and to carrier's responsibility as warehouseman, only, or, at the option of the carrier, may be stored in a public or licensed warehouse at the place of delivery or other available place, at the cost of the owner, and there held without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage."

The above quotation clearly shows that the words "or other available place" refer to the location of the "public or licensed warehouse".

Plaintiff argues that assuming that by the mailing of the nondelivery notice and the expiration of the 48 hours free time (September 17th at 7 a. m.) Lowell there-after had only the responsibility of warehouseman, that nevertheless there was a revival of the common carrier liability of Lowell when, at the shipper's request, Mr. Earle Hutchinson of Lowell's Massachusetts office agreed on or about September 17, 1945 to redeliver the three shipments to Marlene (Nos. L84235—L84236—L83923) (Ex. 10). The three shipments were the 34 carton shipment of September 10th involved in this case, and the two shipments of September 13th removed to the Preferred Warehouse on September 25th. Plaintiff relies on the Lysaght case. But the facts in that case differ radically from those of the case at bar. The principle, as to the revival of the liability of the carrier as a common carrier, was applied by the Circuit Court of Appeals for the Second Circuit in Lehigh Valley R. Co. v. John Lysaght, 2 Cir., 271 F. 906, 909 (certiorari denied, 256 U.S. 704, 41 S.Ct. 625, 65 L.Ed 1180) to a railroad shipment consigned for export on a steamship. Judge Ward said: "The goods were in course of transportation, and the delay at the Black Tom Terminal during the period that the plaintiff failed to give shipping instructions for export for either 48 hours after the notice of arrival under the bill of lading or for 15 days under the tariff changed the defendant's liability to that of warehouseman, but as soon as shipping instructions were given, July 29, at 1:42 p. m., its liability as carrier to transport the goods to New York, county of New York, was reinstated."

In the Lysaght case the shipment had not reached its destination alongside ship. Here the shipment had been tendered to Marlene and refused. The goods were no longer in the course of transportation to their ultimate destination specified in the Bill of Lading.

The effort of Lowell's New York office to have Marlene accept redelivery on September 19th was fruitless. Apparently Marlene informed Lowell that "Marlene will not take in these shipments until next week at least", that "they haven't any room for all this merchandise". The New York office was still hopeful that Marlene eventually would accept the shipment. In fact, the inter-office communication from New

York to Lowell, Massachusetts, said "When we redeliver we will apply redelivery charges and storage". (Ex. 11) The communication added, "As per your instructions if they (Marlene) do not pay we will leave shipments and you can bill shipper". The arrangement Brennan, acting for the shipper, made with Hutchinson of Lowell on or about September 17th and the subsequent effort of Lowell's New York office to get Marlene to agree to accept the shipment did not revive Lowell's liability as a common carrier. Lowell's effort on September 19th to get Marlene to agree to accept redelivery did not make Lowell a common carrier on the night of September 19-20 when the shipment of 34 cartons (L83923) was stolen from Magnone's garage.

■ Plaintiff's contention that Louis Magnone, Inc. was a common carrier for hire is not sustained by the evidence. Magnone did not accept orders from anybody seeking his services. The business concerns for which Magnone carted merchandise in and about New York City were less than a dozen. Lowell Trucking Corporation was one of them. Magnone had separate arrangements with each customer, fixing the compensation to be paid. See, Matter of Motor Haulage Co. v. Maltbie, 1944, 293 N.Y. 338, 57 N.E.2d 41, 161 A.L.R. 401. He had been handling much of Lowell's local deliveries under a verbal arrangement since 1942. As costs mounted in 1945 he would write Lowell for an increase in rates (Exs. 5 and 6). At times a change in rates was arranged over the phone and confirmed by Magnone. (Ex. 7.) Magnone was a local truckman who limited his services to special customers. The liability of Magnone to his customers was that of a bailee for hire. Lowell Transportation Corporation never paid Louis Magnone, Inc. for its delivery services in connection with the 34 cartons although billed for the same (Ex. G).

Louis Magnone, Inc. bought the trucking business of Charles Cohen in December 1942. Cohen had been doing part of Lowell's local trucking work. Magnone was to take over where Cohen left off and on the same terms. Cohen then went to work for Lowell. Magnone promised Lowell just as good service as Cohen had given. Magnone was better off financially than Cohen, and had some trucks of his own, in addition to those he bought from Cohen. Magnone carried just as much insurance for its business and in fact increased it. Magnone did not carry any "over-all risk" policy; but it has not been shown that Cohen had carried any such policy. Magnone got his policy up to $25,000 in all, $5,000 as to any one truck. Lowell never asked Magnone for any policies until November 1, 1945 (Ex. E) and then only "to bring (Lowell's) records up to-date on insurance coverage". Magnone complied; and sent a policy in 1946 also. It was not until the trial that a cross-claim based on an alleged representation as to responsibility and "over-all insurance coverage" was asserted against Magnone. I am satisfied that no such representation was made.

■ I have concluded that plaintiff is entitled to recover from Lowell the value of the 34 cartons because Lowell breached its contract of transportation in respect to the storage provisions thereof and because Lowell was guilty of negligence in leaving this valuable shipment on a truck in Magnone's garage for over a week. Plaintiff has no valid claim against Magnone and the complaint is dismissed on the merits as against Magnone. The cross-claims of Lowell against Magnone are also dismissed on the merits. I am filing findings of fact and conclusions of law, together with this opinion.