**LOVELESS MFG. CO. v. ROADWAY EXP., Inc. (Edwards et al., third party defendants).**

Civ. No. 2717.

United States District Court
N. D. Oklahoma.

May 5, 1952.

---

Wheeler & Wheeler, Tulsa, Okl., for plaintiff.

Pierce, Rucker, Mock, Tabor & Duncan, Tulsa, Okl., for Roadway Express, Inc.

Williams, Boesche & McDermott, Tulsa, Okl., for John C. Edwards, d/b/a, etc.

Rosenstein, Fist & Shidler, Tulsa, Okl., for American Equitable Assur. Co. of New York.

810

WALLACE, District Judge.

This is an action for damages arising out of a contract of carriage. Jurisdiction of the court is based on diversity of citizenship and the required jurisdictional amount. Third parties were brought in under the Third Party Practice, Federal Rules of Civil Procedure, Rule 14(a), 28 U.S.C.A.

Sometime prior to the contract of carriage here involved, a representative of the defendant Roadway Express, Inc.,[1] an Ohio corporation, contacted the plaintiff, Loveless Manufacturing Company,[2] an Oklahoma concern, to solicit the business of transporting a large shearing machine from Hamilton, Ohio, to Tulsa, Oklahoma. At that time, the soliciting agent of Roadway was informed that Loveless had no facilities for unloading the heavy equipment. Upon the representation of the agent that Roadway would do the unloading, Roadway was awarded the carriage contract.

On the 10th of May, 1950, at Hamilton, Ohio, Roadway accepted from the Columbia Machinery and Engineering Company, consignor, a large shearing machine and one box of parts, total weight 17,500 pounds. The machine was transported under a uniform bill of lading issued on May 10, 1950. This bill of lading was delivered to the plaintiff, Loveless, along with an invoice in the amount of $7,160 which Loveless paid.

The machine arrived in Tulsa on the 15th of May, 1950. Roadway transported the machine, which was loaded on its enclosed truck, to the Loveless premises and stopped some eighty to one hundred feet from the point of delivery which was a concrete slab adjacent to the shop of Loveless. Roadway's driver then asked Loveless how the machine was to be unloaded, and the driver was informed by Loveless that he had nothing to do with the unloading and that Roadway was the party responsible for that undertaking. Roadway's driver then called his company and informed it of the situation. Some thirty minutes later another truck with a winch and flat bed trailer arrived at the Loveless premises.

This second truck was owned by John C. Edwards, d/b/a Edwards Transfer Company.[3] Only one man, the driver of the Edwards truck, accompanied this piece of motor equipment, and he along with the driver of the Roadway truck and another employee of Roadway were engaged in transferring the shearing machine from the Roadway truck to the flat bed trailer of the Edwards truck when the machine toppled over and was damaged.

Loveless refused to accept delivery of the damaged machine, which Roadway retained custody of, and filed a claim for the loss with Roadway on June 13, 1950. Roadway refused to pay the claim and Loveless commenced this suit to recover damages for the machine in the amount of $7,160. Roadway filed its answer and by a third party complaint brought in Edwards as a third party defendant. This third party complaint attempted to substitute Edwards in the place of Roadway as the party liable to Loveless, and on motion of Edwards, the third party complaint was dismissed for the attempted substitution of a party with citizenship of the same state as that of the plaintiff, which would in effect make Loveless an involuntary plaintiff against Edwards resulting in defeating Federal jurisdiction.

Roadway then amended its third party complaint and alleged that the defendant, Roadway, engaged the third party defendant, Edwards Transfer Company, to unload the machine; that the third party defendant was an independent contractor in unloading said machine, which was done for and on behalf of the defendant, Roadway; and that the damage to the machine was due to the negligence of the third party defendant. In a separate paragraph, the defendant, Roadway, made precisely the same allegations, with the exception that it was alleged that the Edwards Transfer Company was acting as agent, servant for, and on behalf of Roadway Express, Inc. The defendant then asked for recovery over and against the third party defendant, Edwards, for any part of the damages which

1. Hereinafter referred to as Roadway.

2. Hereinafter referred to as Loveless.

3. Hereinafter referred to as Edwards.

Loveless might recover from Roadway. Edwards again moved to dismiss the third party complaint which motion was overruled.

Edwards, third party defendant, upon motion granted, brought in the American Equitable Assurance Company of New York as an additional third party defendant to the third party complaint of Edwards. The third party complaint filed by Edwards was based upon a contract of insurance. The American Equitable Assurance company moved to have the third party complaint of Edwards dismissed which motion was overruled.

There were several grounds urged by both of the third party defendants for dismissal of the third party complaints. Prior to the 1948 amendment to Rule 14(a) of the Federal Rules of Civil Procedure, there were a number of conflicting decisions which were in part due to the wording of the rule. The amendment in 1948 clarified one difficulty which was encountered by the courts, but third party practice continues to be one of the most difficult of the procedural rules. A careful consideration of the treatment of Rule 14(a) along with the cases cited in the treatises by Barron & Holtzoff, Federal Practice and Procedure, Vol. 1 Rules Edition, §§ 421–427, and Moore's Federal Practice, (2d Ed.) Vol. 3, Paragraphs 14.07, 14.08, 14.10, and 14.26, amply covered all objections urged for dismissal of the third party complaints.

█ After this suit was filed, but before the trial, an offer was made to Roadway for $5,500, for the damaged machine. This was an unexpected and advantageous offer as to all parties concerned, for it resulted in mitigation of damages down to $1,660. Upon agreement of Roadway, Loveless, and Edwards, the damaged machine was sold and Roadway retained the proceeds for proper disposition after a ruling on the merits of the case. Federal jurisdiction was not defeated by the reduction in damages below the jurisdictional amount, for the law is well established that subsequent events reducing the amount recoverable will not defeat Federal jurisdiction once it is invoked. Ford, Bacon & Davis, Inc., v. Volentine, 5 Cir., 64 F.2d 800, 801, and cases cited therein.

█ At the trial of the case, the evidence disclosed that Roadway upon its own volition, without any request of Loveless, and without informing Loveless of any tariff regulations, contacted Edwards for the purpose of acquiring equipment to unload the machine which was subsequently damaged. This arrangement with Edwards was made by authority of Roadway's manager. One of the main controverted facts was the status of Edwards, i. e., whether it occupied the position of an independent contractor or whether the truck and driver of Edwards were hired by Roadway so as to make the driver of the Edwards truck a special servant of Roadway. From all of the testimony elicited at the trial, the court has concluded that the arrangement between Roadway and Edwards was that Edwards was hiring out the truck and driver on an hourly basis, and that Roadway had absolute control or the right to control the unloading operations as well as control over the Edwards truck and driver. It is true that the driver of the Edwards truck was in charge of the operation of the winch mounted on the Edwards equipment, but Roadway was the special master; and the driver of the Edwards truck was the special servant of Roadway due to the element of control being in the hands of Roadway. It should also be noted at this point that the truck rented to Roadway was not defective and was adequate for the work for which it was to be used.

From the complaint of Loveless, it is ascertained that recovery of damages is based upon a breach of the contract of carriage. To the complaint, Roadway answered alleging that the contract of carriage had been completed on its part, and that a tariff regulation made Roadway's employees the agents of Loveless in unloading. At the outset, it is to be noted that Roadway has consistently been inconsistent in its theory of the case. It was first alleged that Edwards was the agent of Loveless, and then in an amended third party complaint which superseded the original, it is alleged that Edwards was the agent of Roadway. Next, it is alleged that delivery of the machine was completed by Road-

way and yet in the suggested findings of fact and conclusions of law filed by Roadway, it takes position that Edwards was engaged to *complete* the delivery.

■ The common law rule is that a common carrier by land is to deliver to the door of the consignee. To the door, or the "place of delivery", means the unloading platform or the customary place used for delivery. Delivery is completed when there is nothing left to be done to finish the transportation. Here there was an element of tranportation remaining, however short a distance it may have been. Ordinarily, the court would be disposed to view the case as being one of completed delivery or at least a valid tender of delivery. However, since the carrier itself takes the position that delivery was not completed, the court will not ignore such a position when there was in fact a small element of transportation still involved.

Assuming that there was a valid tender of delivery, the outcome as to liability of the parties would be the same. Upon the hypothesis that the transportation was at an end and a valid tender of delivery was made, the liability of Roadway would cease to be that of a common carrier or qualified insurer. At this point, the tariff regulation relied upon by Roadway would become important. This tariff is as follows:

"National Motor Freight Classification, Rule 21
"Heavy or Bulky Articles, loading or unloading,

"Sec. 1. Where an article (or articles) in a single container or shiping form tendered, weigh 500 lbs. or more, or if the greatest dimension exceeds 8 feet or greatest and intermediate dimension each exceeds 4 feet, loading or unloading shall be performed by the shipper or consignee, as the case may be. If requested, carriers will undertake, in behalf of the shipper or consignee, as the case may be, to employ additional help. No charge will be made for labor performed by the truck driver, but a charge of one dollar and fifty cents ($1.50) per hour or fraction thereof, for each man furnished, other

than the truck driver, shall apply from time vehicle arrives at the place of pickup or delivery until shipment is loaded or unloaded, as the case may be.
"Exception: .........."

■ There is numerous authority for the proposition that where motor carriers engaged in interstate commerce have on file tariffs stating their rates and regulations, that such tariffs are binding on all parties concerned and have the force and effect of law. Jackson & Perkins Co. v. Mushroom Transportation Co., 351 Pa. 583, 41 A.2d 635, certiorari denied 326 U.S. 733, 66 S.Ct. 42, 90 L.Ed. 427; Annotations to 49 U.S. C.A. §§ 319, 20 (11, 12). The tariffs bind the parties whether they have actual notice of them or not and are a part of the contract of carriage along with the bill of lading. The purpose of some of the tariffs is for regulation and uniformity to prevent unlawful discrimination by the rendition of various services to interstate shippers by common carriers which are not provided for in the other tariffs. The tariff regulation above quoted is one of the regulatory tariffs, and Roadway had no choice, in order to abide by the law, but to heed the terms of such tariff which it had on file with the Interstate Commerce Commission.

Roadway relies upon the tariff to establish as a fact that its employees were the agents of Loveless. The case of Columbus & Greenville Railway Co. v. Owens, 153 Miss. 628, 121 So. 265, 62 A.L.R. 521, would seem to support this view, but the tariff there involved was materially different. In that case, mules were shipped to the consignee and the consignee was not there to receive them. The railroad employees unloaded and put the mules in a pen where they ate rust scales, resulting in death to a number of the animals. The court held that the railroad employees were agents of the owner on the strength of a Consolidated Freight Classification tariff to the effect that any assistance rendered by employees of a railroad or carrier in loading or unloading, shall be construed as purely voluntary and that any such employee shall be considered as the agent of the owner and not of the carrier.

■■ In the case before this court, the evidence discloses that Roadway through its soliciting agent represented that it would unload the shipment on arrival. In addition to this, the evidence discloses that no request was ever made by Loveless to have the carrier employ additional help to unload, nor did Roadway ever call the attention of Loveless to the tariff involved. It cannot be denied that Loveless is charged with constructive notice of the tariff, but if ever the law put a duty upon a person to speak out, such law should be applicable to this case when Roadway was well aware of its own tariff regulation and did not call it to the attention of Loveless. Be that as it may, the fact remains that Roadway did undertake the unloading of the machine. It is immaterial that the tariff put the responsibility of unloading upon the consignee, or stating it negatively, that the carrier could not lawfully do the unloading. The mere fact that the tariff provides that the consignee shall do the unloading does not and cannot logically mean that the carrier could not violate the law or that its agents were the agents of Loveless. This is precisely and clearly stated in the case of Ramsey v. New York Central Railroad Company, 269 N.Y. 219, 199 N.E. 65, 67, 102 A.L.R. 511, 513, 514, where a similar tariff was involved. In the Ramsey case the court said:

"It is pointed out that the tariff provision made it illegal for the respondent railroad company to do the work of unloading the car, and that it must be presumed that it was not engaged in doing an illegal act. It is hard to see the distinction. So far as the legality of its act is concerned, what difference does it make whether we say it was unloading the car itself or that it loaned the crane and its operator to the construction company to do the work? In either case, it retained the absolute control of its machinery and its operator.

"The fact is undisputed that the respondent's crane was being operated by its servant over whom it retained complete control. *The rule of the Commission cannot change the facts. It*

*would be strange indeed if the respondent, by violating the rule of the Commission could by such violation* or by loaning its servant to the construction company change its relation to the employee and make such employee the servant of the construction company without the consent of the servant or of the construction company, either expressed or implied.* * * *". (Emphasis added.)

In American Jurisprudence, Volume 9, Carriers, § 467, it is stated that "A carrier which has assumed the duty of loading or unloading the shipment is liable for such damages as result from its failure to do so in a proper manner." Roadway introduced testimony of its own employees who were engaged in the unloading operation that there was negligence on the part of some of the unloading crew. Over and above this, Roadway breached the terms of the contract as contained in the bill of lading. Section 4(a) of the bill of lading provides:

"Sec. 4. (a) Property not removed by the party entitled to receive it within the free time allowed by tariffs, lawfully on file (such free time to be computed as therein provided), after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly sent or given, and after placement of the property, for delivery at destination has been made, may be kept in vessel, car, depot, warehouse or place of delivery of the carrier, subject to the tariff charge for storage and to carrier's liability as warehouseman, only, or at the option of the carrier, may be removed to and stored in a public or licensed warehouse at the place of delivery or other available place, at the cost of the owner, and there held without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage."

The identical section was involved in the case of Textron, Inc., v. Lowell Trucking Corporation, D.C., 74 F.Supp. 322. In that case, the court held that even though the consignee refused to accept delivery

after a valid tender that the carrier was liable for the loss of goods where the carrier did not comply with the terms of the contract of carriage. Here Roadway had no alternative after the attempted delivery, still assuming that a valid tender of delivery was made, but to comply with the provisions of the bill of lading herein set out. Instead, Roadway undertook to unload the machine in violation of the tariff.

It will be the judgment of the court that Loveless recover from Roadway the sum of $1,660 plus the sale price of the damaged machine, $5,500, or a total of $7,160. The case is dismissed as to the third party defendant, Edwards, which effectively disposes of the third party complaint against the American Equitable Assurance Company of New York.

It is not necessary under the decision of the court to decide the issues raised between Edwards and its insurer as to the duty to defend and the right to attorney fees for the refusal of the insurer to defend the case. These issues are therefor left for a decison by the proper court at the proper time.

Counsel are directed to submit a journal entry in conformity with this opinion within ten days from this date.