**TRANS–COLD EXPRESS, INC., Appellant,**

v.

**James HARDIN, Appellee.**

**No. 11493.**

Court of Civil Appeals of Texas.

Austin.

May 10, 1967.

Rehearing Denied May 31, 1967.

Passman, Jones, Stewart, Andrews & Hunter, Bill C. Hunter, Dallas, for appellant.

James, Ingram & Glenn, Tom James, Dallas, for appellee.

O'QUINN, Justice.

Appellant contracted with appellee to get a truckload of dressed lambs hauled from San Angelo, Texas, to Brooklyn, New York, in May, 1963. Appellee hauled the lambs to New York, and appellant brought suit claiming the cargo was damaged by spoilage while in the hands of appellee in breach of the contract. Appellee answered with a counter-claim for freight charges and denied that the cargo was damaged before delivery to the consignee in New York.

The cargo of lambs belonged to Armour and Company at San Angelo and was consigned to H. C. Bohack Company in Brooklyn. Appellant, Trans-Cold Express, Inc., was the carrier, with the appellee, James Hardin, the contractor engaged by appellant to do the hauling.

After trial before the district court without a jury, the court found against Trans-

Cold Express, Inc., on its suit and entered judgment for James Hardin in the amount of $1,188.42 on his cross-action. Trans-Cold Express has appealed.

The written contract under which appellee moved the lambs for appellant from San Angelo to Brooklyn was made April 24, 1963. The contract provided that appellee would pay for any shortage or loss of cargo transported and for damage to the cargo.

Appellee loaded the cargo of 575 dressed lambs weighing 28,626 pounds at San Angelo May 15, 1963, under schedule to deliver the lambs to Bohack Company in Brooklyn by midnight of Sunday, May 19. Appellee arrived in Brooklyn at the Bohack address about 2 o'clock Sunday afternoon and tried to unload the meat, but was instructed by Bohack employees to wait until next morning, May 20, before unloading. Next morning, beginning about 8 o'clock, appellee started unloading at the instance of Bohack employees.

After some thirty lambs had been placed on racks and rails, and rolled out on the dock at Bohack's plant so the meat could be put into refrigeration by Bohack employees, the unloading stopped. The unloaded meat remained on Bohack's dock, without refrigeration, until about 11 o'clock, when appellee was told that Bohack refused to accept the shipment. Appellee was instructed to reload the lambs he had taken out.

Appellee reloaded the thirty lambs and advised Armour and Company, at its Fort Greene Place location in New York, that Bohack had refused delivery. Armour instructed appellee to drive the meat to Armour. Appellee arrived at Armour about 12 o'clock noon, and around 2 o'clock that afternoon Armour made an inspection of the thirty lambs that had been unloaded and re-loaded at Bohack's dock that morning. The inspection consisted of taking the temperature of the meat and examining it for discoloration and "tackiness."

It was shown at the trial that dressed lamb of the nature transported by appellee should be kept under refrigeration at a temperature of 36 to 38 degrees. Temperatures above 38 degrees cause the meat to get pink and turn sweaty and slick, producing a condition known in the industry as "tacky."

The inspections at Armour were made in the presence of appellee who confirmed the findings. The thirty lambs inspected showed a temperature ranging from 44 to 50 degrees and were found to be wet and tacky in places. No readings were made on the balance of the lambs.

Later in the afternoon another inspection was made by a contract inspector who found temperatures from 40 to 45 degrees and an overall poor condition of the lambs, rendering the meat not fit for human consumption "without reconditioning."

Armour caused about three-fourths of the meat to be unloaded at its plant and directed appellee to deliver the remaining one-fourth to Salmon and Company in New York.

The record shows that Armour made a claim to appellant, and appellant paid it, in the amount of $2,887.40, being the difference between the market value of the cargo at its destination in the sum $12,810.00 and the sale price of $9,922.60. Appellant sued appellee for $1,698.98, which was the amount of the Armour claim of $2,887.40, less an offset of $1,188.42. Appellee filed a cross-action for hauling charges in the sum of $1,313.93, plus reasonable attorney's fees of $750.

The cause was tried before the court without aid of a jury on April 21, 1966, and the court entered judgment June 20, 1966, decreeing that appellant, Trans-Cold Express, Inc., take nothing by its suit and awarding judgment for $1,188.42 to appellee, James Hardin. Upon request the trial court made and filed findings of fact and conclusions of law. Trans-Cold Ex-

press, Inc., perfected the appeal now before this Court.

Appellant predicates its appeal on ten points of error and presents them in three groups. (1) Points one through five are directed to the issue of when appellee's duty to protect the cargo ended. (2) Points six through eight assign error of the trial court in excluding the written claim of Armour and Company. (3) Points nine and ten assert the contention that even if appellant used the wrong measure of damages, appellant was entitled to nominal damages, and the cause should be remanded to permit appellant to prove substantial damages.

We overrule all the assignments of error and will discuss them by the groups and in the order presented by appellant.

That the cargo was delivered to appellee in San Angelo in good condition appears to be without dispute. Appellee testified, and there is no evidence to the contrary, that he maintained a temperature of 36 to 38 degrees en route to New York. There is no contention that dressed lambs deteriorate while under refrigeration except at temperatures higher than 38 degrees. The first evidence of temperatures higher than 38 degrees came from Armour's inspection, at 2 o'clock in the afternoon, of the thirty lambs that had been unloaded at 8 o'clock that morning on Bohack's dock.

Appellant relies upon the holding of the Supreme Court of Texas in Missouri Pacific Railroad Company v. Elmore and Stahl, 368 S.W.2d 99 (Tex.1963) for the proposition that the carrier is liable for damage to an interstate shipment of inanimate perishables when the cargo is delivered to the carrier in good condition and is in a damaged condition when delivered at the destination. We are unable to agree that this holding is in point under the facts of the case at bar.

In the Missouri Pacific case, supra, 640 crates of honeydew melons were shipped from Rio Grande City, Texas, to Chicago,

Illinois. There it was undisputed that when delivery at destination was made the damage had already occurred.

In the case before this Court there is no evidence of damage to the dressed lambs when appellee arrived at Bohack Company in Brooklyn Sunday afternoon and offered to unload the cargo; nor is there evidence of damage at 8 o'clock next morning when Bohack told appellee to start unloading on Bohack's dock. The unloading, for reasons not clear from the record, did not continue, but Bohack did not refuse delivery of the cargo until 11 o'clock, some three hours later. But at this time there appears to have been no evidence of damage to the cargo. The first evidence, as already pointed out, developed with the inspection at Armour's plant, six hours after appellee started unloading on the Bohack dock.

Appellant argues that appellee never delivered the cargo to Bohack, the consignee, and that Bohack never accepted the cargo. Appellee takes the position that delivery was made when appellee backed his truck up to Bohack's dock, the destination specified in the bill of lading, and upon Bohack's express assent started unloading. At this point, appellee contends, appellee's duty as a carrier ended.

The trial court, in finding for appellee, concluded that damage to the meat resulted from failure of Bohack to accept delivery when tendered, and that appellee had not breached the contract.

In cases involving delivery by railroads the rule is that if the cars containing the goods consigned are spotted on a private siding of the consignee, and the consignee has a right to unload at any time, delivery of the cargo by the carrier to the consignee is complete. United Firemen's Ins. Co. v. Thompson, Tex.Civ.App., Galveston, 259 S.W.2d 612 (writ. ref., n. r. e.). In general, if the carrier safely transports the consigned goods to the consignee at the destination specified, the carrier's liability as such is terminated by refusal of

the consignee to accept delivery at the place named in the contract. Finck Cigar Factory v. American Ry. Express Co., Tex. Civ.App., Galveston, 283 S.W. 219 (no writ); 149 A.L.R. 1118, and cases cited.

■ Under the facts of this cause there is authority for holding that the role of appellee as carrier terminated Sunday afternoon at 2 o'clock, May 19, when he arrived at Bohack Company and offered to unload. The bill of lading called for delivery at the Bohack Brooklyn plant May 19 before midnight. Bohack's employees refused to permit appellee to unload when he arrived and told him he would have to wait until next morning.

The rule is stated in American Jurisprudence that, "Where goods have arrived at their destination, and at the request and for the convenience of the consignee are allowed to remain in the custody of the carrier, its liability as an insurer of the goods ceases and becomes thereafter that of a warehouseman or a depositary." 13 Am.Jur.2d, Carriers, sec. 404, p. 887. See also discussion and cases cited under "postponement of acceptance" in 149 A.L.R. 1118, 1120–22.

In Missouri Pacific Railroad Co. v. Elmore and Stahl the Supreme Court, dealing with an interstate shipment, determined liability of the carrier by federal statutes and decisions. 368 S.W.2d 99, 101, col. 2. We find General American Transportation Corporation v. Indiana Harbor Belt Railroad Company, U. S. Circuit Court of Appeals (Seventh Circuit) 191 F.2d 865, authority for holding appellee's responsibilities as carrier were terminated by refusal of Bohack to let him unload Sunday after he arrived in Brooklyn. This case involved shipment of sixty-six carloads of knocked-down French box cars manufactured in Indiana and consigned to an agency of the French government at Galveston, Texas, for trans-shipping overseas. After arrival in Galveston, the cars were diverted to Texas City, on order of consignee, to be held in a terminal for shipment by sea. The sixty-six cars while still in custody of the carrier were damaged or destroyed by the Texas City explosions and fires in April, 1947.

The court held that, the cargo having arrived at its destination, the carrier's liability as an insurer of the property ceased when, at the request and for the convenience of the consignee, the shipment remained in the custody of the carrier. In this lawsuit Bohack refused to accept delivery on the day and at the place named in the bill of lading and left the truckload of lambs in the hands of appellee until next morning. It seems apparent that the delay was for the convenience of the consignee.

Appellant argues that mere arrival of the goods at the destination does not reduce the liability of the carrier to that of a warehouseman if anything remains to be done by the carrier to effectuate delivery, relying upon the holding of Keystone Motor Freight Lines v. Brannon-Signaigo C. Co., U. S. Court of Appeals, Fifth Circuit, 115 F.2d 736. In that case a quantity of cigars were shipped from New Orleans, Louisiana, to Dallas, Texas. The usual custom of the parties was to ship on Friday and make delivery Saturday morning. The carrier was delayed en route and did not arrive until Saturday afternoon, when the consignee's business was closed. While being held over the week-end awaiting delivery on Monday, the cigars were stolen.

The court held that the consignee was entitled to a reasonable opportunity to take or receive the property from possession of the carrier after transit was terminated. The court found that the closing of the consignee's business on Saturday afternoon resulted from a business custom long followed, and was not an isolated act designed to defeat delivery. The fact the business was so closed was sufficient to defeat the claim of tender of the shipment Saturday afternoon. In the case at bar Bohack had two reasonable opportunities to take or receive the shipment of lambs, the first on Sunday afternoon, when delay forced by

Bohack defeated delivery, and the second on Monday morning when Bohack told appellee to put the cargo on Bohack's dock. It is immaterial to the results in this case whether the tender on Sunday afternoon or the unloading started Monday morning served to relieve appellee of his role as carrier and reduced his duty to that of a bailee. At neither time was there any showing of damage to the cargo. All the evidence of damage establishes the state of the cargo six to twenty-four hours after appellee had discharged his contract as a carrier. There is no showing that the condition of the meat when inspected Monday afternoon related back to the time the cargo was in transit.

The bill of lading relating to the shipment of lambs, dated May 15, 1963, the day appellee left San Angelo, was issued by Armour and Company as consignor, to H. C. Bohack, as consignee, with appellant as the carrier. This instrument purports to be a Uniform Bill of Lading, with provision under section 4 for disposition of perishable property refused by consignee after carrier has transported the cargo to destination. Under this section the carrier is authorized to sell the cargo "to prevent deterioration or further deterioration," or, before selling, the carrier may notify the consignor and ask for disposition. Appellee, acting under the bill of lading, notified Armour in New York and was directed to deliver the cargo to Armour, which appellee accomplished approximately within the next hour.

◼◼ If inanimate perishables, delivered to the carrier in good condition, are found in a damaged condition when delivered at destination, the carrier can escape responsibility for the damage only by showing that the damage was caused solely by an act of God, the public enemy, fault of the consignor, or the inherent nature of the cargo itself. Missouri Pacific Railroad Co. v. Elmore and Stahl, supra. Appellant argues that without question the lambs were in damaged condition when ·appellee delivered them to Armour following Bohack's refusal to accept delivery, and that the rule stated is applicable. We cannot agree. The rule applies where damage is found at the time of delivery, to the consignee, and at the destination named in the bill of lading.

The damaged condition of the lambs was established for the first time at the Armour plant, not at Bohack Company, with an inspection made two hours after the lambs were delivered to Armour, three hours after Bohack refused delivery, and six hours following placement of the first meat on Bohack's racks to be refrigerated. The inspection also was 24 hours after appellee arrived at destination and attempted to make delivery to Bohack but met with delay imposed by Bohack. The trial court found that at the time Bohack refused delivery, about 11 o'clock, complaint was made to appellee concerning the condition of the thirty lambs that had remained on Bohack's dock since about 8 o'clock without refrigeration, but no complaint was made about condition of the meat still in appellee's trailer.

◼ We conclude that delivery was made at the destination in a manner sufficient to remove appellee from the status of carrier and insurer of the cargo. Tender of the cargo at its destination to the consignee, followed by actual delivery to the dock of a portion of the cargo, constituted delivery as a matter of law, and served to terminate appellee's responsibilities as a carrier and reduce his liability to that of an ordinary bailee or warehouseman. The record does not show any evidence of damage to the cargo at that time.

◼ Appellant apparently seeks to hold appellee on their contract of April 24, 1963, even after his role was reduced to that of warehouseman. With respect to the unloaded portion of the lambs, appellee as contractor for the carrier had performed his contract with appellant. The unloaded lambs were on Bohack's dock to be refrigerated by Bohack, and were no longer a

part of the cargo transported. There is no evidence that the cargo remaining in the trailer was damaged at all. At the time of delivery the issue of liability and duty for shipment was under the terms of the bill of lading for refusal of a perishable cargo. The record shows that appellant paid the claim of Armour, but did not assert any contractual right against Bohack. Appellant's liability to Armour, upon refusal of delivery by the consignee, was defined by the bill of lading providing for disposition of perishable goods. Appellee followed this provision by notifying Armour immediately after Bohack refused delivery, and in compliance with Armour's directions, delivered the cargo to Armour about an hour later. Payment of the Armour claim was purely voluntary, without legal requirement, and appellant may not now look to appellee as indemnitor to reimburse appellant. Mitchell's, Inc. v. Friedman, 157 Tex. 424, 303 S.W.2d 775.

■ Under assignments six through eight appellant asserts error in excluding the written claim of Armour with various attachments. The written claim, with seven attachments, including the contract inspector's report, was offered in its entirety as Exhibit No. 7 on the theory it was admissible under Article 3737e, (Vernon's Ann.Tex.Sts.) as a business record.

The trial court rejected the attachments which apparently were prepared by several persons, none of whom was before the court in person or by deposition to identify the writings. The attachments were not business records of either appellant or Armour. Statements contained in the attachments as to damages were hearsay. Olive and Stirnenberg v. Hester, 63 Tex. 190; Housley v. Strawn Merchandise Co., (Tex.Com.App., 1927), 291 S.W. 864; Panhandle and Santa Fe Ry. Co. v. McDonald, Tex.Civ.App., Eastland, 227 S.W.2d 601 (writ ref.).

■ Appellant failed to prove, by the witness through whom Exhibit No. 7 was offered, the essential elements to establish the exception to the hearsay rule. There was no proof made that the various documents attached to Armour's claim were made in the regular course of business, at or near the time of the acts or conditions sought to be shown, or reasonably soon thereafter, by employees or agents customarily making such records or customarily transmitting information to be placed in the records, and who had personal knowledge of the acts or conditions recorded. Exhibit No. 7, with attachments, was properly excluded by the trial court. 23 Tex.Jur.2d, Evidence, Sec. 330, p. 481.

Exclusion of Exhibit No. 7 was harmless, even if it had been error. The parties had stipulated as the amount of the Armour claim and to the fact appellant had paid the claim in full. The deposition of the contract inspector reflecting the results of his examination of part of the cargo on Monday afternoon was admitted over objection.

Appellant contends under assignments nine and ten that the trial court erred in not awarding damages, even if nominal, for breach of the contract of April 24, 1963, between appellant and appellee. The trial court concluded appellee had not breached the contract. The greater weight of the evidence shows that the lambs appellee transported were not damaged at the time of delivery. Appellant did not sustain the burden properly on it to show a breach of duty by appellee in performance of the contract, and the cause of action does not arise if proof is not made. G. & M. Products Corporation v. Clayton Specialties, Inc., Tex.Civ.App., Houston, 386 S.W.2d 843 (no writ).

The judgment of the district court is affirmed.

Affirmed.