**The CHIEF FREIGHT LINES COMPANY, Appellant,**

v.

**HOLIDAY INNS OF AMERICA, INC., et al., Appellees.**

**No. 17657.**

Court of Civil Appeals of Texas, Dallas.

June 25, 1971.

R. Douglas Coffin, Bean, Francis, Ford, Francis & Wills, Dallas, for appellant.

Jack L. Coke, Jr., Phinney, Hallman, Pulley & Livingstone, Dallas, for appellees.

GUITTARD, Justice.

This is a suit by a consignee against a motor carrier for damage to freight as it was being unloaded from carrier's truck. The principal question is whether the carrier's strict liability as a qualified insurer under the Interstate Commerce Act, 49 U.S.C., § 20(11), had terminated by tender to the consignee for unloading before the damage was done. We hold that it had so terminated.

The freight in question, a crated 550-pound refrigerator "reconstituting unit," was shipped on a uniform bill of lading from Hudson, New York to the consignee, Continental Trailways, at its bus station and restaurant in Dallas. Defendant Chief Freight Lines was the delivering carrier. The applicable tariff, which is conceded to be a part of the contract of carriage, contains the following provision:

"When freight in a single container * * * weighs 500 pounds or more * * * loading shall be performed by the consignor and unloading shall be performed by the consignee.

"On request of a consignor or consignee, the truck driver will assist the consignor or the consignee in loading or unloading."

The freight arrived in Dallas in apparent good order. The truck arrived at Continental's place of business about 4:30 to 5:00 p. m. The driver contacted Continental's auditor, R. D. Howard, who came in and got the restaurant manager, Clarence Walker. The driver asked for help in unloading, but Walker advised that all workers had gone. The truck had a hydraulic lift gate. There is evidence that the carrier had attempted to make delivery earlier in the day, but, finding that Continental had no receiving dock or unloading equipment, took the freight away, transferred it to a truck with a hydraulic lift gate, and brought it back.

After talking with Howard and Walker, the driver backed the truck into the bus driveway. Walker testified that he and Howard "went out to receive the equipment." Their participation from then on is in dispute. Either Howard or Walker evidently consented to the unloading, since both were present and one of them furnished the driver several pieces of small pipe to use as rollers in moving the box containing the freight back onto the hydraulic lift gate. The driver testified that the box was too heavy for him to handle alone and that one or both of the Continental employees helped him tilt it, put the pipes under it and push it. Walker said that neither he nor Howard touched it until after it fell. Howard did not testify.

After the box was moved onto the lift gate, the driver got down from the truck bed and operated the controls to lower the box to the pavement. According to Walker, no one attempted to steady it as it came down and, when it was almost to the pavement, the back end of the gate dropped and the box toppled over. Walker had the impression that one of the pipes was still under the box as it came down. Walker said he intended to push the box off the lift gate and leave it on the pavement, but it fell off the gate. After it fell, the Continental employees helped set it upright. One of them signed a receipt for the freight, noting "possible damage."

Walker testified that he was not supervising the unloading and gave the driver no instructions, but would not say whether Howard did or not. Neither Walker nor the driver knew of the tariff provision requiring the consignee to unload.

Plaintiff's petition is limited to a claim on the contract of carriage and contains no allegations of negligence. The answer alleges that the tariff provision required the consignee to unload and that the damage was done by the consignee while unloading.

The trial court, sitting without a jury, resolved all questions of fact and law in favor of the consignee. The court found that when the hydraulic gate touched

the floor, the box fell off and hit the floor, coming to rest on its side, that neither of the Continental employees participated in any manner in the unloading, and that the first time they touched it was when they assisted the driver in picking it up after it fell. The court concluded that when the damage occurred the property was under control and in possession of the carrier and that the carrier had not yet transferred possession and control to the consignee. In supplemental findings the court found that the driver assumed the duty to unload exercising ordinary care, that he "failed to perform the unloading exercising ordinary care when the unit was lowered without being secured from tipping," and that such breach of the assumed duty was negligence and a proximate cause of the damage. Judgment was rendered for the amount of the damage, and the carrier appeals.

The carrier's principal contention is that under the tariff provision which requires the consignee to unload, after it tendered the freight to the consignee for unloading, its driver was acting merely to assist the consignee and was under the consignee's control, and therefore it was not liable as a qualified insurer under its contract of carriage. One of the principal cases cited by the carrier is Wajay Bakery, Inc. v. Carolina Freight Carriers Corp., 177 So.2d 544 (Fla.Dist.Ct. of App., 1965), in which the Florida court held that under an identical tariff provision, a carrier was not liable for damage to a machine being unloaded by a contractor employed by the consignee with the help of the carrier's employee.

Continental contends that since the trial court found that the carrier's driver undertook to unload the freight and not merely to assist consignee's employees, and that the damage occurred while he was doing so, the carrier cannot escape liability under the Interstate Commerce Act for the damage it caused, even though the unloading may have been undertaken in violation of the applicable tariff. Continental relies

on Loveless Manufacturing Co. v. Roadway Express, 104 F.Supp. 809 (D.C.N.D. Okla.1952), in which the carrier had agreed, contrary to the provisions of a similar tariff, that it would unload a machine after shipment, and contracted for such unloading with a transfer company, whose employees damaged the machine in the process of moving it to the transfer company's truck. The court held that since the carrier undertook the unloading, it was liable for the damage notwithstanding the consignee's responsibility to unload. Continental also cites Hayes Freight Lines v. Hamilton, 257 S.W.2d 60 (Ky.1953), in which the Court of Appeals of Kentucky held that under a similar tariff the truck driver was acting as an employee of the carrier rather than of the consignee in assisting the consignee to unload a boiler.

Since the cases cited are in conflict and no controlling Texas authority has been brought to our attention, we have examined the basis of the carrier's strict liability as declared in statute and case law. This examination has convinced us that after an effective tender of delivery, liability for any damage occurring must be based on pleading and proof of negligence attributable to the carrier.

Since the shipment was interstate, the Interstate Commerce Act and the decisions under it control. The pertinent provisions of that act are found in 49 U.S.C., § 20 (11), which provides that a delivering carrier shall be liable for "the full actual loss, damage, or injury to such property caused by it" notwithstanding any limitation of liability in any agreement or tariff. The Supreme Court of the United States has held that this statute codifies the common law rule that a carrier, though not an absolute insurer, is liable for damages to goods transported by it unless it can show that the damage was caused by (1) act of God, (2) public enemy, (3) act of shipper, (4) public authority, or (5) inherent vice or nature of the goods. Missouri P. R. Co. v. Elmore,

377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964).

Although the original reason for holding common law carriers liable as insurers was to prevent collusion with thieves and robbers, Gulf, C. & S. F. R. Co. v. Gatewood, 79 Tex. 89, 14 S.W. 913, 10 L.R.A. 419 (1890), modern authorities recognize broader grounds, including stimulating care and fidelity on the part of the carrier, the carrier's exclusive possession of evidence concerning the circumstances of the loss, the difficulties of shipper and consignee in discovering and proving the carrier's fault, and the carrier's ability to adjust its rates to cover the hazards. Chicago & E. I. R. Co. v. Collins Produce Co., 249 U.S. 186, 39 S.Ct. 189, 63 L.Ed. 552 (1919); Chesapeake & O. R. Co. v. Crenshaw, 148 Va. 48, 138 S.E. 467, 53 A.L.R. 990 (1927).

These reasons apply when the carrier has exclusive possession and control of the goods for purposes of transportation. They do not apply when control or right of control is transferred to the consignee by tender of delivery. Thus the rule has been established that when the carrier tenders delivery to the consignee at a suitable time and place and gives him reasonable opportunity to receive the goods, the carrier's strict liability ceases, and if the goods remain in the carrier's custody after that time its responsibility is reduced to that of an ordinary bailee or warehouseman, that is to say, liability must depend on proof of the carrier's negligence. General American Transportation Corp. v. Indiana Harbor Belt R. Co., 191 F.2d 865 (7th Cir. 1951, cert. den. 343 U.S. 905, 72 S.Ct. 636, 96 L.Ed. 1324); Hines v. First Guaranty State Bank of Aubrey, 243 S.W. 972 (Tex.Comm'n App.1922); United Firemen's Ins. Co. v. Thompson, 259 S.W.2d 612 (Tex.Civ.App., Galveston 1953, writ ref'd n. r. e.); American Express Co. v. Duncan, 193 S.W. 411 (Tex. Civ.App., Fort Worth 1917, no writ); Anthony & Jones Co. v. New York Central & H. R. R. Co., 223 N.Y. 21, 119 N.E. 90 (1918); Deer Park Baking Co. v.

Cleveland & Chicago Motor Express Co., 68 N.E.2d 824 (Ohio Ct. of App.1946). The goods need not actually be unloaded or stored, nor need any charge be made for storage, in order for the carrier's liability to be reduced to that of a warehouseman. Southwest Nat. Bank v. Missouri, K. & T. Ry. Co., 18 S.W.2d 807 (Tex.Civ.App., Waco 1929, writ ref'd). In accordance with these rules, the Supreme Court of the United States has recognized that for rate-making purposes the carrier's duty is performed when it delivers goods by placing them in such a position as to make them accessible to the consignee, and that normally unloading is not part of the delivery but is performed by the consignee. Secretary of Agriculture v. United States, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015 (1954).

The question is whether the carrier made a tender of delivery which terminated its strict liability before the damage was done. We hold that it did. Under the applicable tariff the consignee had the duty to unload, and therefore also the right to unload. When the truck was backed into the bus driveway and the consignee's employees consented to the unloading, there was at least a tender of delivery. Possibly Continental's men could have refused to accept delivery until they had a reasonable opportunity to have the freight unloaded by their own employees or contractor, but they did not choose to do that. They consented to the unloading by the driver, who was bound to assist them and hence to follow their directions. They had the right to participate in the unloading or to supervise the manner in which it was done. The fact that they did not give any directions or physically participate in moving the freight until after the damage was done does not detract from the consignee's contract right to control the unloading.

None of the recognized reasons for imposition of strict carrier liability apply here. The circumstances of the loss were as observable to the consignee's employees

as to the truck driver. Presumably, under the tariff, which required the consignor to load and the consignee to unload, the rate was calculated to cover the line-haul transportation together with its attendant risks from the time loading was completed by the consignor until the time the freight was tendered for unloading by the consignee, and did not include any charge for unloading or for the risk of damage in that process. Secretary of Agriculture v. United States, supra. It does not matter whether the truck driver was acting in violation of the tariff in providing unloading service beyond the requirements of the contract or whether he was merely assisting the consignee as the tariff permitted. Under the above authorities, any service after tender of the freight to the consignee for unloading was not a common-carrier service and did not give rise to a common carrier's strict liability. Since any discrimination was in the consignee's favor, we are unable to follow the reasoning in Loveless Manufacturing Co. v. Roadway Express, 104 F.Supp. 809 (D.C.N.D.Okla.1952) that such an undertaking by the carrier beyond tariff requirements was itself ground for imposing strict liability.

Our conclusion is supported by the nearest Texas authority we have been able to find. In Trans-Cold Express, Inc. v. Hardin, 415 S.W.2d 431 (Tex.Civ.App., Austin 1967, no writ), the Austin Court of Civil Appeals held that delivery of a cargo of refrigerated dressed lambs was complete when the carrier's truck was backed up to the consignee's dock and the carrier's employees, with the consignee's assent, began to unload the cargo, so that the carrier's responsibility thereafter was reduced to that of an ordinary bailee or warehouseman.

■ Appellee-consignee contends in the alternative that appellant's liability as an ordinary bailee has been established by the trial court's supplemental findings that the truck driver undertook responsibility for unloading and that in carrying out that undertaking he failed to use ordinary care in securing the box from tipping as he lowered it to the pavement. Although the petition does not allege such an undertaking or any act of negligence upon the part of the driver, appellee contends that these issues were tried by implied consent. Nothing in the record before us shows any implied consent. Appellee says that the negligence issue was raised by appellant's argument in the trial court, not brought forward here, in support of its request for additional findings, that its liability was that of a warehouseman only. The request for additional findings is before us and we find nothing in it that can be construed as an invitation to the trial court to try the negligence issue. Even if it were shown that appellant raised the negligence question in argument to the trial court, such an argument cannot be considered as raising new issues to be tried by implied consent after judgment had been rendered and signed and the original findings and conclusions had been filed. Consequently, we cannot hold that liability for negligence has been established.

■ Since the judgment against the carrier cannot be upheld either on the theory of the carrier's strict liability or on the ground that the carrier's liability as an ordinary bailee was tried by implied consent, we must now decide whether to render judgment for the carrier or remand for a new trial. We have discretion to remand if there are probably issues concerning the carrier's responsibility as an ordinary bailee which have not been fully developed because the case was tried on the wrong theory. Southwestern Motor Transport Co. v. Valley Weathermakers, Inc., 427 S.W.2d 597 (Tex.Sup.1968); Texas Sling Co. v. Emanuel, 431 S.W.2d 538 (Tex.Sup.1968). In this respect the controlling question is whether the provisions of the tariff, which are conceded to be part of the contract, placed the driver under control of the consignee so

as to make him a borrowed employee of the consignee at the time the damage occurred.

▮ The carrier cites personal injury cases decided under similar tariff regulations, holding that a carrier is not liable for negligence of its general employee loaned to a consignee or its contractor to assist in unloading. Cloughley v. Orange Transportation Co., 80 Idaho 226, 327 P.2d 369 (1958); Rockwell v. Grand Trunk Western Ry. Co., 264 Mich. 626, 250 N.W. 515 (1933); Rau v. Wilkes-Barre & E. R. Co., 311 Pa. 510, 167 A. 230 (1933); Denton v. Yazoo & M. V. R. Co., 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310 (1931). The carrier argues that the ultimate test under these authorities is, whose work is being done? It insists that since the consignee had the duty to unload, the consignee also had the right to control the details of such unloading, and therefore the carrier has no responsibility for the damage. Continental relies on Ramsey v. New York Central R. Co., 269 N.Y. 219, 199 N.E. 65, 102 A.L.R. 511 (1935), another personal injury case which is in apparent conflict with those cited by the carrier, since it holds that a railroad employee operating his company's crane in unloading a shipment which the consignee was required by tariff to unload did not become a loaned employee of the consignee so as to relieve the carrier of liability for his negligence.

The question of the carrier's liability as an ordinary bailee after termination of its strict carrier responsibility is not necessarily the same as that of whether such strict responsibility had terminated by reason of tender of delivery, though on both questions the right to control the unloading operation is the decisive factor. We have held that upon such tender the consignee's duty to unload implies the right to control the unloading process, and that right, whether or not exercised, was inconsistent with any further strict liability on the part of the carrier. However, even though the consignee had the right under the contract to take over the unloading, there may be a fact issue as to whether it was actually in control at the time the damage was done. Continental could have relinquished control over the details of the work to an independent contractor employed for that particular job. We see no reason why it could not also relinquish that control to the carrier if the carrier was willing to assume it, though in doing so the carrier may have subjected itself to whatever sanctions the Interstate Commerce Act may have imposed for violation of the tariff.

Some evidence that the truck driver had assumed a greater responsibility than merely to assist the consignee in unloading may be found in testimony that the carrier first attempted delivery in a truck not equipped with a hydraulic lift, and that when the consignee's employees advised that they had no facilities to unload, the carrier took the freight away, transferred it to a truck which was so equipped, and came back to do the unloading by that means. Ignorance by both the driver and the consignee's employees of the tariff requiring the consignee to unload is also pertinent here, though not on the question of whether a delivery had been tendered under the contract. The Texas Supreme Court has held that when the rights of the parties are not clearly controlled by contract, the borrowed servant issue is a question of fact. J. A. Robinson Sons, Inc. v. Wigart, 431 S.W.2d 327 (Tex.Sup. 1968); Producers Chemical Co. v. McKay, 366 S.W.2d 220 (Tex.Sup.1963). Since we do not know what additional evidence will be offered on another trial, we cannot say whether the question will be one of fact or of law, but we think that justice will be best served by a new trial at which these matters can be more fully developed.

Reversed and remanded.