## 49766. TERMINAL TRANSPORT COMPANY, INC. v. BURGER CHEF SYSTEMS, INC. et al.

PANNELL, Presiding Judge.

On November 4, 1968, appellee sold 49 ice cream machines to the Freezie Corporation. On January 31, 1969, the machines were shipped from Indianapolis, Indiana to Atlanta, Georgia via appellant under ten uniform order bills of lading and accompanying sight drafts and consigned to appellee. Freezie was to receive the equipment from appellant only if Freezie first honored the drafts at an Atlanta bank and obtained the original bills of lading containing appellee's endorsements. The crates arrived on February 4 and 5, 1969. As Freezie was not prepared to submit the originals of the ten uniform bills of lading, the property was placed in storage on the latter date. Appellee notified appellant of that fact by form letters entitled: "On Hand Notices," dated February 10 and 20, 1969, which also contained the advice that the property would be sold if not claimed. However, appellant's practice was to hold such shipments for varying lengths of time, up to two years in one case. To accomplish storage, appellant issued "Free Astray Billings" to Arrow Bonded Warehouse, but failed to indicate that the shipments were subject to appellee's security interest by stamping "Order Notify" on the freight bills. Appellant kept the fifth copy of the freight bills, which copy was surrendered when Freezie produced an endorsed original bill of lading. Appellee was not furnished a copy of the freight bills. On April 1, 1969, four crates were released by Arrow to Freezie upon surrender of proper documentation, id.; five more were released similarly on April 28, 1969. On May 16, 1969, upon receipt of notice from appellant that freight charges to Atlanta from Indianapolis must be paid or the remaining equipment "sold as junk," appellee paid them. Accrued

storage costs at Arrow were paid by Freezie as each pick-up occurred. On July 10, 1969, Freezie obtained ten additional machines from Arrow per two original bills of lading. As of August 8, 1969, appellee knew that the remaining sight drafts had not been honored, would probably not be, and that the remaining thirty crates were still stored. On December 5, 1969, Arrow released the remaining crates to Freezie; ten upon proper presentation of two original bills of lading, and twenty apparently upon production of only the 5th copies of the freight bills held by appellant, which permitted Freezie to obtain twenty machines without cost. No notification of this final release was furnished by Arrow to either appellant or appellee. In early April 1970, appellant advertised the last thirty machines for sale at public auction, only to learn about April 17, 1970, of the earlier release by its agent, Arrow, on December 5, 1969. Appellee was not advised of the discovered loss. On January 5, 1971, appellee learned of the loss and on January 13, 1971, filed a claim, which was denied on February 5, 1971, by appellant's claims agent because not made within the time limit established by the bill of lading.

The jury, on October 10, 1973, rendered a verdict against appellant; judgment being filed October 11, 1973. A motion for judgment n.o.v. was filed November 9, 1973, and overruled on April 8, 1974. Appeal followed. *Held:*

The parties are in substantial agreement that the sole basic question, upon which appeal is predicated, is whether the jury verdict is in harmony with Section 2(b) of the uniform order bills of lading, which provides in pertinent part:

"As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or carrier issuing this bill of lading, or carrier on whose line the loss, damage, injury or delay occurred within nine months after delivery of the property . . . or, *in the case of failure to make delivery then within nine months after a reasonable time for delivery has elapsed . . .*" (Emphasis supplied.)

Examination of this stipulation discloses that the initial portion is intended to apply to claims generated by the loss, damage, injury or delay during shipment and

known or capable of being ascertained on delivery. For example, see East Texas Motor Freight Lines v. United States, 239 F2d 417 (C. A. 5, 1956). The latter portion of the stipulation applies when there is no delivery, through loss or misdelivery, and the shipper or consignee knew of the approximate delivery date. For example, see *Ga., Fla. & Ala. R. Co. v. Blish Milling Co.*, 15 Ga. App. 142 (82 SE 784), aff'd 241 U. S. 190 (36 SC 541, 60 LE 948); and see Sydnor & Hundley, Inc. v. Wilson Trucking Corp., 213 Va. 704 (194 SE2d 733) (1973). The facts in the instant case distinguish themselves and are without the ambit of this stipulation. Appellant's argument that the nine months within which to file a claim commenced on February 5, 1969, when the machines arrived in Atlanta, lacks logic. The machines arrived in Atlanta without loss, injury, delay or misdelivery. Indeed, the construction urged by appellant would render nugatory the provisions of sub-sections (a) and (b) of Section 4 of the same bill of lading, upon which the appellant relied in placing the goods in storage and taking its subsequent actions.

Subsection (a) of Section 4, supra, provides in general that, when property is not claimed after notice of arrival, the carrier may place the property in storage and fixes his responsibility as that of a warehouseman, subject to notification of the parties shown on the bill of lading, and reflecting the warehouse in which the property has been placed. Subparagraph (b) then provides generally that, after failure to claim the property within 15 days after notice of arrival, the carrier may sell the property at public auction upon publication of a notice of sale in a local newspaper of general circulation for two consecutive weeks, providing further that 30 days shall have elapsed between the mailing of the notice to the consignor and the publication of notice of sale. Thus, under Section 4 the carrier has the option of protecting its interest through a sale of unclaimed property, if desired, and provided it complies with required notice provisions; applying the proceeds of any such sale to the payment of freight, storage and other lawful charges, including necessary expenses related to the sale, with the balance to be paid to the owner as authorized by Section 7 of the bill of lading.

In the instant case, the appellant elected to follow the

route of Section 4 of the bill of lading and its procedures. The latter delineates two phrases. First, the right to warehouse the goods, with notice to the consignor. Second, the carrier's optional right to sell unclaimed goods after a given time and upon publication of notice of sale. The appellant did not elect to exercise its permissive right to sell. Thus, while its strict liability as a carrier ceased on storing the machines with Arrow, its responsibility merely reduced to that of ordinary bailee, or warehouseman, and liability devolved on proof of its negligence. Chief Freight Lines Co. v. Holiday Inns of America, Inc., 469 SW2d 413, 417 (1971). A carrier cannot release himself from responsibility by abandoning the goods or turning them over to one not entitled to receive them. N. Penna. R. Co. v. Commercial Nat. Bank, 123 U. S. 727 (8 SC 266, 31 LE 287). We hold, therefore, that the appellant was obligated to protect the machinery concerned and this it did not do.

We turn then to the requirement of a claim. The requirement for a written claim is addressed to a "practical exigency and is to be construed in a practical way." Ga., Fla. & Ala. R. Co. v. Blish Milling, supra. In the case sub judice, we view the facts in accordance with the ordinary course of business, in the light of the circumstances and conditions surrounding the transaction. Here, appellant and appellee both knew that Freezie would not claim the shipment, as is evidenced by the fact that the goods were placed in storage the day of arrival of the entire shipment, and thereafter picked up "piece-meal" by Freezie. This practice had been employed by appellant on other occasions, and for various periods up to two years. Also worthy of consideration was the fact that on May 16, 1969, appellant only requested payment of freight charges and threatened sale of the remainder of the machinery if such was not done. No mention of sale for any other purpose was reflected and, indeed, partial pick-up of the machinery by Freezie subsequently was accomplished by Freezie on July 10, 1969 and on December 5, 1969. Thus, to appellee's ostensible belief, the remaining 20 machines were still in storage and subject to their security interest. At this time, it may be reasonably inferred that appellant's original negligence

in failing to stamp the freight billings "order notify" manifested itself, and the fifth copies of the "Free Astray Billings" were released by appellant's personnel to Freezie and thus permitted their presentation to Arrow for accomplishment of the release of the remaining machinery without payment to appellee. This compounded negligence is chargeable to appellant, as is appellant's failure to ascertain until on or about April 17, 1970, that the machinery had been released in derogation of appellee's security interest. Thus, as of the time of conversion, appellee was entitled to presume that its property was properly stored under Terminal's control. It would be difficult to impose a requirement on appellee under the circumstances here prevailing to notify appellant of the loss of property under appellant's control. "The purpose of requiring notice is to give the carrier a fair opportunity to investigate the merits of the alleged loss, so that unjust claims may be thwarted; to give the carrier an opportunity to investigate the merits of the claim when the facts are fresh and the information is readily obtainable." R. W. Gess Commission Co. v. Ill. Cent. R. Co., 186 SW 1136, 1137 (Mo. App. 1916). Appellant had all the information and all the facts at its disposal to investigate the loss and hence, any requirement for notice by appellee to appellant was inapplicable in this case. Hopper Paper Co. v. B. & O. R. Co., 178 F2d 179, cert. den. 339 U. S. 943. Contra, we believe that under the facts of this case that appellant had a duty to inform appellee of the conversion of the machinery when it learned of it and investigated it. *Atlantic C. L. R. Co. v. Ousley Co.,* 37 Ga. App. 215 (139 SE 586) (1927); *Moor v. Southern Pacific Co.,* 35 Ga. App. 288 (132 SE 920) (1926). Having failed to notify appellee, at least when it learned of the conversion, the date of misdelivery must be taken as that when the required notice was actually given, i.e., January 5, 1971. Accordingly, appellee's claim was filed timely.

We also might observe that taking the date of appellant's receipt of knowledge of misdelivery in mid-April, 1970, as the date to activate the running of the nine months within which to file a claim, appellant's claim was timely on January 13, 1971.

*Judgment affirmed. Webb, J., concurs. Evans, J., concurs in the judgment only.*

ARGUED OCTOBER 2, 1974 — DECIDED DECEMBER 5, 1974— REHEARING DENIED DECEMBER 19, 1974 — 

*Harold H. Clokey,* for appellant.
*Weltner, Kidd, Crumbley & Tate, Charles M. Kidd,* for appellees.